# Supreme Court of Florida

_____

No. SC12-1947
_____

**TIMOTHY LEE HURST,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[October 14, 2016]

PER CURIAM.

This case comes before the Court on remand from the decision of the United States Supreme Court in Hurst v. Florida, 136 S. Ct. 616 (2016) (Hurst v. Florida), following its certiorari review and reversal of our decision in Hurst v. State, 147 So. 3d 435 (Fla. 2014) (Hurst v. State).  In that case, we affirmed Timothy Lee Hurst's death sentence, which was imposed after a second penalty phase sentencing proceeding.  We held there, consistent with longstanding precedent, that Florida's capital sentencing scheme was not violative of the Sixth Amendment or the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002).  See Hurst v. State, 147 So. 3d at 445-46.  We concluded that section 921.141, Florida Statutes (2012), the capital sentencing statute under which Hurst

was sentenced to death, was not unconstitutional for failing to require the jury to expressly find the facts on which the death sentence was imposed in this case. Id. at 446. After Hurst sought certiorari review in the United States Supreme Court, that Court granted review in Hurst v. Florida, 135 S. Ct. 1531 (2015), and agreed to entertain the following question:

> Whether Florida's death sentencing scheme violates the Sixth Amendment or the Eighth Amendment in light of this Court's decision in Ring v. Arizona, 536 U.S. 584 (2002).

Id. at 1531.

Upon review, the Supreme Court reversed our decision in Hurst v. State and held, for the first time, that Florida's capital sentencing scheme was unconstitutional to the extent it failed to require the jury, rather than the judge, to find the facts necessary to impose the death sentence—the jury's advisory recommendation for death was "not enough." Hurst v. Florida, 136 S. Ct. at 619. In so holding, the Supreme Court overruled its decisions in Spaziano v. Florida, 468 U.S. 447 (1984), and Hildwin v. Florida, 490 U.S. 638 (1989), to the extent they approved Florida's sentencing scheme in which the judge, independent of a jury's factfinding, finds the facts necessary for imposition of the death penalty. See Hurst v. Florida, 136 S. Ct. at 624. The Supreme Court's ruling in Hurst v. Florida also abrogated this Court's decisions in Tedder v. State, 322 So. 2d 908 (Fla. 1975), Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002), Blackwelder v. State,

851 So. 2d 650 (Fla. 2003), and State v. Steele, 921 So. 2d 538 (Fla. 2005), precedent upon which this Court has also relied in the past to uphold Florida's capital sentencing statute. Finally, the Supreme Court refused to take up the issue of whether the error in sentencing was harmless, but left it to this Court to consider on remand whether the error was harmless beyond a reasonable doubt. Hurst v. Florida, 136 S. Ct. at 624.

On remand, this Court accepted additional briefing and held oral argument concerning the effect of the Supreme Court's decision in Hurst v. Florida on capital sentencing in Florida, as well as on issues raised by Hurst and other issues of import to this Court. Hurst and amici curiae[1] contend first that Hurst should be granted an automatic life sentence under the provisions of section 775.082(2), Florida Statutes (2016). Failing that, Hurst contends that the constitutional error in his sentencing proceeding cannot be deemed harmless beyond a reasonable doubt and that instead a new penalty phase proceeding is required.

---

1. The Court granted leave to file amici briefs to former Florida Supreme Court Justice Harry Lee Anstead; former Florida Supreme Court Justice Gerald Kogan; former Florida Supreme Court Justice and current judge on the Iran-United States Claims Tribunal Rosemary Barkett; former president of the American Bar Association Martha Barnett; former president of the American Bar Association Talbot D'Alemberte; former president of The Florida Bar Hank Coxe; the Florida Center for Capital Representation at Florida International University College of Law; and the Florida Association of Criminal Defense Lawyers.

As we will explain, we hold that the Supreme Court's decision in Hurst v. Florida requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury. We reach this holding based on the mandate of Hurst v. Florida and on Florida's constitutional right to jury trial, considered in conjunction with our precedent concerning the requirement of jury unanimity as to the elements of a criminal offense. In capital cases in Florida, these specific findings required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances. We also hold, based on Florida's requirement for unanimity in jury verdicts, and under the Eighth Amendment to the United States Constitution, that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous.

For the reasons we will explain, we reject Hurst's claim that section 775.082(2), Florida Statutes (2016), mandates that Hurst receive an automatic life sentence. However, we conclude that the error in Hurst's sentencing identified by the United States Supreme Court was not harmless beyond a reasonable doubt. Thus, we remand for a new penalty phase proceeding. We will address these

issues in turn after a brief review of the facts and procedural background of this case.

## I.  FACTS AND PROCEDURAL BACKGROUND

The background and facts of this case were reiterated in our decision in

Hurst v. State in pertinent part as follows:

> Hurst was convicted for the May 2, 1998, first-degree murder of Cynthia Harrison in a robbery at the Popeye's restaurant where Hurst was employed in Escambia County, Florida.  The victim, also an employee, had been bound and gagged and repeatedly cut and stabbed with a weapon consistent with a box cutter found at the scene.  Hurst's conviction and death sentence were originally affirmed in Hurst v. State, 819 So. 2d 689 (Fla. 2002).  In that decision, we set forth the facts surrounding the murder as follows:

>> On the morning of May 2, 1998, a murder and robbery occurred at a Popeye's Fried Chicken restaurant in Escambia County, Florida, where Hurst was employed.  Hurst and the victim, assistant manager Cynthia Lee Harrison, were scheduled to work at 8 a.m. on the day of the murder.  A worker at a nearby restaurant, Carl Hess, testified that he saw Harrison arriving at work between 7 a.m. and 8:30 a.m.  Afterwards, Hess said that he saw a man, who was about six feet tall and weighed between 280 and 300 pounds, arrive at Popeye's and bang on the glass windows until he was let inside.  The man was dressed in a Popeye's uniform and Hess recognized him as someone he had seen working at Popeye's.  Shortly after the crime, Hess picked Hurst from a photographic lineup as the man he had seen banging on the windows.  Hess was also able to identify Hurst at trial.
>> . . . .
>> Popeye's was scheduled to open at 10:30 a.m. but Harrison and Hurst were the only employees scheduled to work at 8 a.m.  However, at some point before opening, two other Popeye's employees arrived, in

addition to the driver of the supply truck. None of them saw Hurst or his car. At 10:30 a.m., another Popeye's assistant manager, Tonya Crenshaw, arrived and found the two Popeye's employees and the truck driver waiting outside the locked restaurant.

. . . .

The victim suffered a minimum of sixty incised slash and stab wounds, including severe wounds to the face, neck, back, torso, and arms. The victim also had blood stains on the knees of her pants, indicating that she had been kneeling in her blood. A forensic pathologist, Dr. Michael Berkland, testified that some of the wounds cut through the tissue into the underlying bone, and while several wounds had the potential to be fatal, the victim probably would not have survived more than fifteen minutes after the wounds were inflicted. Dr. Berkland also testified that the victim's wounds were consistent with the use of a box cutter. A box cutter was found on a baker's rack close to the victim's body. Later testing showed that the box cutter had the victim's blood on it. It was not the type of box cutter that was used at Popeye's, but was similar to a box cutter that Hurst had been seen with several days before the crime.

Hurst's friend, Michael Williams, testified that Hurst admitted to him that he had killed Harrison. . . .

Another of Hurst's friends, "Lee-Lee" Smith, testified that the night before the murder, Hurst said he was going to rob Popeye's. On the morning of the murder, Hurst came to Smith's house with a plastic container full of money from the Popeye's safe. Hurst instructed Smith to keep the money for him. Hurst said he had killed the victim and put her in the freezer. Smith washed Hurst's pants, which had blood on them, and threw away Hurst's socks and shoes. Later that morning, Smith and Hurst went to Wal-Mart to purchase a new pair of shoes. They also went to a pawn shop where Hurst saw some rings he liked, and after returning to Smith's house for the stolen money, Hurst returned to the shop and purchased the three rings for $300. . . .

The police interviewed Smith and searched a garbage can in Smith's yard where they found a coin purse that contained the victim's driver's license and other property, a bank bag marked with "Popeye's" and the victim's name, a bank deposit slip, a sock with blood stains on it, and a sheet of notebook paper marked "Lee Smith, language lab."

Hurst v. State, 147 So. 3d at 437-38 (quoting Hurst v. State, 819 So. 2d 689, 692-94 (Fla. 2002)).  Hurst was convicted of first-degree murder and the case proceeded to a penalty phase trial to determine what sentence should be imposed. After a penalty phase proceeding was conducted under the provisions of section 921.141, Florida Statutes (1998), at which evidence of aggravating factors and mitigating circumstances was presented, the jury returned an advisory verdict by a vote of eleven to one recommending that Hurst be sentenced to death.  The trial court sentenced Hurst to death and this Court affirmed the first-degree murder conviction and the death sentence.  Hurst v. State, 819 So. 2d at 703.

Hurst then filed his initial postconviction motion under Florida Rule of Criminal Procedure 3.851 alleging a number of claims, including that trial counsel provided ineffective assistance of counsel in investigating and presenting mitigation in the penalty phase trial.  Hurst appealed the trial court's denial of postconviction relief to this Court.  We affirmed denial of relief on most of the claims, but vacated the death sentence and remanded for a new penalty phase proceeding because trial counsel's performance was deficient in failing to

investigate and present available, significant mental health mitigation, resulting in prejudice. We explained:

> During the penalty phase of trial, no expert testimony of mental mitigation was presented. Defense counsel did not have Hurst examined by a mental health expert prior to the penalty phase, even though Hurst's former counsel, an assistant public defender, had filed a motion for a mental evaluation. When the court took up the motion, Hurst's trial attorney stated that he did not see any reason to have Hurst examined. Thus, the motion for mental evaluation was denied and no mental evaluation was ever done. Nor did counsel obtain and present school records of the defendant, who was just nineteen at the time of the crime. The records would have shown that Hurst had a low IQ, was in special education classes, and dropped out of school after repeating tenth grade.

Hurst v. State, 18 So. 3d 975, 1009 (Fla. 2009). We stated: "We reverse the trial court's order denying relief as to [Hurst's] penalty phase claim of ineffective assistance of counsel in investigation and presentation of mental mitigation, vacate his sentence of death, and remand for a new penalty phase proceeding before a jury, which may consider available evidence of aggravation and mitigation." Id. at 1015-16.

Thus, the case returned to the trial court for a new penalty phase trial before a jury, which occurred on March 5-9, 2012. At this proceeding, the State presented evidence concerning the murder because the new sentencing jury had not heard evidence concerning the facts and circumstances surrounding the murder. Hurst presented mitigating evidence consisting, in pertinent part, of expert testimony concerning brain damage, low IQ, and other significant mental health mitigation.

He also presented mitigating evidence concerning his childhood and poor performance in school. At the conclusion of the penalty phase evidence, the jury was instructed that it should determine if sufficient aggravating circumstances existed to justify recommending imposition of the death sentence, and whether the mitigating circumstances outweighed the aggravating factors. The jury was also instructed to provide the judge with a recommendation as to the punishment to be imposed, which the jury was told was advisory in nature and not binding, but would be given great weight.

The jury in the second penalty phase proceeding ultimately recommended a sentence of death by a vote of seven to five, and the trial court sentenced Hurst to death. In the sentencing order, the judge found as aggravating factors that the murder was committed while Hurst was engaged in the commission of a robbery, although he was not charged with robbery and the jury did not find him guilty of robbery, and the judge found that the murder was especially heinous, atrocious, or cruel. See §§ 921.141(5)(d), (h), Fla. Stat. (2012). In mitigation, the trial court found the statutory mitigating circumstances that Hurst had no significant history of prior criminal activity, that he was nineteen years old, and that he had an even younger mental age. See §§ 921.141(6)(a), (g), Fla. Stat. (2012). The trial court found other mitigating circumstances proven. It found that Hurst had "significant mental issues," including "limited mental and intellectual capacity," and

"widespread abnormalities in his brain affecting impulse control and judgment consistent with fetal alcohol syndrome." See Hurst v. State, 147 So. 3d at 440.

Hurst again appealed to this Court and the sentence was affirmed. See id. at 449. In that appeal, citing Ring, Hurst contended that constitutional error occurred in his resentencing proceeding because the jury was not required under Florida law to find the specific aggravating factors, and that the jury's recommendation of death was not required to be unanimous.[2] See id. at 445. The majority of this Court rejected the claim based on longstanding precedent including Bottoson, 833 So. 2d 693, and King v. Moore, 831 So. 2d 143 (Fla. 2002). See Hurst v. State, 147 So. 3d at 446. We also relied on Hildwin, 490 U.S. 638, which predated Ring, in which the United States Supreme Court held that the jury was not required to make specific findings authorizing the imposition of a death sentence.[3] See Hurst v. State, 147 So. 3d at 446.

---

2. Hurst's counsel requested an interrogatory verdict, but that request was denied.

3. Recognizing this Court's reliance on the Supreme Court's "repeated support of Florida's capital sentencing scheme in pre-Ring cases," the Supreme Court in Hurst v. Florida confirmed that in Hildwin, 490 U.S. 638, it had "held that the Sixth Amendment '[did] not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.' " Hurst v. Florida, 136 S. Ct. at 621 (quoting Hildwin, 490 U.S. at 640-41). In Hurst v. Florida, the Supreme Court overruled its earlier decisions in Hildwin and Spaziano, which "summarized earlier precedent to conclude that 'the Sixth Amendment does not require that the

- 10 -

It is from this affirmance of Hurst's death sentence, imposed after the second penalty phase proceeding, that Hurst sought and obtained certiorari review in the United States Supreme Court, and where that Court agreed that portions of Florida's capital sentencing scheme are unconstitutional.  Hurst v. Florida, 136 S. Ct. at 621.

## II.  EFFECT OF HURST V. FLORIDA ON FLORIDA'S CAPITAL SENTENCING

The Supreme Court granted certiorari to resolve the question of whether Florida's capital sentencing scheme violates the Sixth Amendment in light of Ring, 536 U.S. 584.[4]  This required the Supreme Court to determine if the holding in Ring applies to Florida's capital sentencing scheme under the dictates of the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, and the right to a jury trial, with all its attendant protections in capital prosecutions.  Thus, it is helpful to look first at what the Supreme Court held in Ring and the cases before and after that ruling.  In Ring, the Supreme Court considered Arizona's capital sentencing scheme that allowed the

specific findings authorizing the imposition of the sentence of death be made by a jury.' "  Hurst v. Florida, 136 S. Ct. at 623 (quoting Hildwin, 490 U.S. at 640-41).

4.  The question posed by the Supreme Court in granting certiorari review also included reference to the Eighth Amendment, but the Court did not decide the case on Eighth Amendment grounds.

- 11 -

trial judge, sitting alone, to determine the presence or absence of aggravating factors required by Arizona law for imposition of a death sentence. Id. at 588. The issue before the Court in Ring was made more difficult because the Supreme Court had earlier held in Walton v. Arizona, 497 U.S. 639 (1990), that Arizona's death penalty law "was compatible with the Sixth Amendment because the . . . facts found by the judge qualified as sentencing considerations, not as 'element[s] of the offense of capital murder.' " Ring, 536 U.S. at 588 (quoting Walton, 497 U.S. at 649).

Ten years after Walton, the Supreme Court decided Apprendi v. New Jersey, 530 U.S. 466 (2000), in which the Court held that the Sixth Amendment does not permit a defendant in a noncapital case, without additional jury findings, to be exposed to a penalty exceeding the maximum he would receive if the punishment was based only on the facts reflected in the jury's guilty verdict. Implementing this same principle in Ring—and applying it to capital defendants—the Supreme Court stated that "[t]his prescription governs . . . even if the State characterizes the additional findings made by the judge as 'sentencing factor[s].' " 536 U.S. at 589 (quoting Apprendi, 530 U.S. at 492). The Court in Ring held, "Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. In its analysis, the Supreme Court

debunked the contention that the maximum penalty for murder in Arizona was death. The Court explained that a defendant convicted of first-degree murder cannot receive a death sentence unless, under the challenged law in that state, the judge makes critical factual findings that allow the imposition of the sentence of death. Id. at 602.

After noting that "the superiority of judicial factfinding in capital cases is far from evident," and the fact that most states responded to the Court's Eighth Amendment decisions by entrusting the factfinding necessary for imposition of the death penalty to juries, the Supreme Court in Ring stated: "The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both." 536 U.S. at 607-09.

In concluding that the facts upon which a greater sentence may be imposed are "elements," the Court in Ring noted Justice Stevens's dissent in Walton, which Ring overruled. See id. at 599. The Court in Ring stated that in his dissent in Walton, Justice Stevens noted that in 1791, when the Sixth Amendment became law, the jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was "particularly well established." He wrote in part:

> "[T]he English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury had the power to determine not only whether the defendant was guilty of homicide but also the degree of the offense. Moreover, <u>the jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well established.</u> Throughout its history, the jury determined which homicide defendants would be subject to capital punishment by making factual determinations, many of which related to difficult assessments of the defendant's state of mind. By the time the Bill of Rights was adopted, the jury's right to make these determinations was unquestioned."

<u>Ring</u>, 536 U.S. at 599 (quoting <u>Walton</u>, 497 U.S. at 710-11 (Stevens, J., dissenting) (emphasis in opinion) (quoting Welsh S. White, <u>Fact-Finding & the Death Penalty: The Scope of a Capital Defendant's Right to Jury Trial</u>, 65 Notre Dame L. Rev. 1, 10-11 (1989))).

Justice Scalia, joined by Justice Thomas, commented in his concurrence in <u>Ring</u> that the "accelerating propensity of both state and federal legislatures to adopt 'sentencing factors' determined by judges that increase punishment beyond what is authorized by the jury's verdict . . . cause[s] me to believe that our people's traditional belief in the right of trial by jury is in perilous decline," and

> [t]hat decline is bound to be confirmed, and indeed accelerated, by the repeated spectacle of a man's going to his death because <u>a judge</u> found that an aggravating factor existed. We cannot preserve our veneration for the protection of the jury in criminal cases if we render ourselves callous to the need for that protection by regularly imposing the death penalty without it.

536 U.S. at 611-12 (Scalia, J., concurring). Justice Scalia emphasized that "wherever those factors exist they must be subject to the usual requirements of the

- 14 -

common law, and to the requirement enshrined in our Constitution, in criminal cases: they must be found by the jury beyond a reasonable doubt." Id. at 612 (Scalia, J., concurring).[5]

After Ring, the Supreme Court decided Blakely v. Washington, 542 U.S. 296 (2004), in which it again applied Apprendi and held that the trial judge could not impose an "exceptional sentence" above the statutory maximum after making a judicial determination that the defendant acted with deliberate cruelty in committing a noncapital offense. Blakely, 542 U.S. at 298. In applying its holding in Apprendi to Blakely, the Court stated:

> Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed. 1981) (describing the jury as "secur[ing] to the people at large, their just and rightful controul in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850) ("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the

---

5. Justice Breyer concurred in the judgment in Ring, reiterating his long-held view that the Eighth Amendment requires the jury, not the judge, to actually sentence the defendant in a capital case. Ring, 536 U.S. at 614 (Breyer, J., concurring in result). Justice O'Connor dissented and opined that facts that increase the maximum penalty should not be treated as elements. Id. at 619 (O'Connor, J., dissenting).

Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958) ("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); Jones v. United States, 526 U.S. 227, 244-248 (1999). Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

Blakely, 542 U.S. at 305-06 (emphasis added). The Supreme Court also made clear that "the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power." Id. at 308. The Court rejected the criticism that leaving the finding of all these facts to the jury impairs the efficiency or fairness of criminal justice. Id. at 313. The Court explained that "[t]here is not one shred of doubt, however, about the Framers' paradigm for criminal justice" which is the "common-law ideal of limited state power accomplished by strict division of authority between judge and jury." Id. "As Apprendi held, every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id.

Against this backdrop of decisions implementing the guarantees of the Sixth Amendment in Apprendi, Ring, and Blakely, the Supreme Court issued its opinion in Hurst v. Florida, holding that Florida's capital sentencing scheme violated the Sixth Amendment and the principles announced in Ring by committing to the judge, and not to the jury, the factfinding necessary for imposition of the death

penalty. The Supreme Court in <u>Hurst v. Florida</u> began its opinion with the clear dictate that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." 136 S. Ct. at 619. The Supreme Court made clear, as it had in <u>Apprendi</u>, that the Sixth Amendment, in conjunction with the Due Process clause, "requires that each element of a crime be proved to a jury beyond a reasonable doubt." <u>Id.</u> at 621 (citing <u>Alleyne v. United States</u>, 133 S. Ct. 2151, 2156 (2013)). The Court reiterated, as it had in <u>Apprendi</u>, "that any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to [the] jury." <u>Id.</u> (quoting <u>Apprendi</u>, 530 U.S. at 494).

Before reaching its conclusion in <u>Hurst v. Florida</u> that Florida's capital sentencing scheme violated this guarantee of the right to a jury trial on all elements of the crime of capital murder, the Supreme Court evaluated Florida's existing capital sentencing scheme by first noting that, pursuant to section 775.082(1), Florida Statutes (2012), the maximum sentence a capital felon may receive on the basis of the conviction alone is life imprisonment. <u>Id.</u> at 620. That statute made clear that a person convicted of a capital felony shall be punished by death only if a separate sentencing proceeding "results in findings by the court that such person shall be punished by death." <u>Id.</u> (quoting § 775.082(1), Fla. Stat. (2012)). The Supreme Court analyzed Florida's scheme as one in which a jury renders only an

advisory verdict without specifying the factual basis of its recommendation, while the judge evaluates the evidence of aggravation and mitigation and makes the ultimate sentencing determinations. Id. at 620. The Court stated, "Florida law required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty. . . . We hold this sentencing scheme unconstitutional. The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Id. at 619.

Thus, the Supreme Court was aware that Florida precedent, as well as the applicable capital sentencing scheme,[6] required the judge's sentencing order to "reflect the trial judge's independent judgment about the existence of aggravating and mitigating factors." Id. at 620 (quoting Blackwelder, 851 So. 2d at 653). The Supreme Court also distinguished Arizona law and explained that Florida law, similar to the law invalidated in Ring, did not require the jury to make the critical findings necessary to impose death, but required the judge to make these findings—rejecting as significant the distinction that Florida provides for a jury recommendation as to sentence, whereas Arizona law does not. Id. at 622. "A Florida trial court no more has the assistance of a jury's findings of fact with

_____

6. See § 921.141(3), Fla. Stat. (2012); § 775.082(1), Fla. Stat. (2012).

- 18 -

respect to sentencing issues than does a trial judge in Arizona." Id. (quoting

Walton, 497 U.S. at 648). The Court explained that in Florida, the trial judge has

no jury findings on which to rely. Id. (citing Steele, 921 So. 2d at 546).

A close review of Florida's sentencing statutes is necessary to identify those

critical findings that underlie imposition of a death sentence, which is a matter of

state law. First, section 775.082(1), Florida Statutes (2012), provided:

> (1) A person who has been convicted of a capital felony shall
> be punished by death if the proceeding held to determine sentence
> according to the procedure set forth in s. 921.141 results in findings
> by the court that such person shall be punished by death, otherwise
> such person shall be punished by life imprisonment and shall be
> ineligible for parole.

§ 775.082(1), Fla. Stat., (emphasis added). Section 921.141, Florida Statutes

(2012), provided in pertinent part as follows:

> (1) SEPARATE PROCEEDINGS ON ISSUE OF
> PENALTY.—Upon conviction or adjudication of guilt of a defendant
> of a capital felony, the court shall conduct a separate sentencing
> proceeding to determine whether the defendant should be sentenced to
> death or life imprisonment as authorized by s. 775.082. . . .
> (2) ADVISORY SENTENCE BY THE JURY.—After hearing
> all the evidence, the jury shall deliberate and render an advisory
> sentence to the court, based upon the following matters:
> (a) Whether sufficient aggravating circumstances exist as
> enumerated in subsection (5);
> (b) Whether sufficient mitigating circumstances exist which
> outweigh the aggravating circumstances found to exist; and
> (c) Based on these considerations, whether the defendant
> should be sentenced to life imprisonment or death.
> (3) FINDINGS IN SUPPORT OF SENTENCE OF DEATH.—
> Notwithstanding the recommendation of a majority of the jury, the
> court, after weighing the aggravating and mitigating circumstances,

shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:

(a) That <u>sufficient aggravating circumstances</u> exist as enumerated in subsection (5), and

(b) <u>That there are insufficient mitigating circumstances to outweigh the aggravating circumstances</u>.

§ 921.141(1)-(3), Fla. Stat. (2012) (emphasis added).

Pursuant to this sentencing scheme, Hurst's jury recommended death by a vote of seven to five. The trial court then sentenced Hurst to death after independently determining that the murder was especially heinous, atrocious, or cruel and that the murder was committed while Hurst was engaged in the commission of a robbery, both statutory aggravating factors. These two aggravating factors were assigned great weight by the judge. In order to impose the death sentence, the trial judge also found that the aggravators outweighed the mitigators, and set forth those findings in the sentencing order. <u>Hurst v. Florida</u>, 136 S. Ct. at 620.

After evaluating Florida's laws and concluding that the decision in <u>Ring</u> applies equally to Florida's capital sentencing scheme, the Supreme Court held:

As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's authorized punishment based on her own factfinding. In light of <u>Ring</u>, we hold that Hurst's sentence violates the Sixth Amendment.
. . . .

- 20 -

> The Sixth Amendment protects a defendant's right to an impartial jury. <u>This right required Florida to base Timothy Hurst's death sentence on a jury's verdict, not a judge's factfinding.</u> Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional.

<u>Id.</u> at 624 (emphasis added). In reaching these conclusions, the Supreme Court flatly rejected the State's contention that although "<u>Ring</u> required a jury to find every fact necessary to render Hurst eligible for the death penalty," the jury's recommended sentence in Hurst's case necessarily included such findings. <u>Id.</u> at 622. The Court emphasized that this contention is belied by the fact that the law under which Hurst was sentenced expressly required that a person may not be sentenced to death without "findings by the court" that such person shall be so punished. <u>Id.</u> (quoting § 775.082(1), Fla. Stat.). The Supreme Court emphasized that under Florida law, before the sentence of death may be imposed, "the trial court alone must find 'the facts . . . [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances.' " <u>Id.</u> (quoting § 921.141(3), Fla. Stat. (2012)). The Supreme Court was explicit in <u>Hurst v. Florida</u> that the constitutional right to an impartial jury "required Florida to base Timothy Hurst's death sentence on a jury's verdict, not a judge's factfinding." <u>Id.</u> at 624.

Upon review of the decision in <u>Hurst v. Florida</u>, as well as the decisions in <u>Apprendi</u> and <u>Ring</u>, we conclude that the Sixth Amendment right to a trial by jury

- 21 -

mandates that under Florida's capital sentencing scheme, the jury—not the judge—must be the finder of every fact, and thus every element, necessary for the imposition of the death penalty. These necessary facts include, of course, each aggravating factor that the jury finds to have been proven beyond a reasonable doubt. However, the imposition of a death sentence in Florida has in the past required, and continues to require, additional factfinding that now must be conducted by the jury. As the Supreme Court long ago recognized in Parker v. Dugger, 498 U.S. 308 (1991), under Florida law, "The death penalty may be imposed only where <u>sufficient</u> <u>aggravating circumstances</u> exist that <u>outweigh</u> mitigating circumstances." <u>Id</u>. at 313 (emphasis added) (quoting § 921.141(3), Fla. Stat. (1985)). Thus, before a sentence of death may be considered by the trial court in Florida, the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances.[7]

_____

7. Accordingly, we reject the State's argument that <u>Hurst v. Florida</u> only requires that the jury unanimously find the existence of one aggravating factor and nothing more. The Supreme Court in <u>Hurst v. Florida</u> made clear that the jury must find "each fact necessary to impose a sentence of death," 136 S. Ct. at 619, "any fact that expose[s] the defendant to a greater punishment," <u>id.</u> at 621, "the facts necessary to sentence a defendant to death," <u>id.</u>, "the facts behind" the punishment, <u>id.</u>, and "the <u>critical findings</u> necessary to impose the death penalty," <u>id.</u> at 622 (emphasis added). Florida law has long required findings beyond the existence of a single aggravator before the sentence of death may be recommended or imposed. <u>See</u> § 921.141(3), Fla. Stat. (2012).

- 22 -

These same requirements existed in Florida law when Hurst was sentenced in 2012—although they were consigned to the trial judge to make.

We also conclude that, just as elements of a crime must be found unanimously by a Florida jury, all these findings necessary for the jury to essentially convict a defendant of capital murder—thus allowing imposition of the death penalty—are also elements that must be found unanimously by the jury. Thus, we hold that in addition to unanimously finding the existence of any aggravating factor, the jury must also unanimously find that the aggravating factors are sufficient for the imposition of death and unanimously find that the aggravating factors outweigh the mitigation before a sentence of death may be considered by the judge.[8]  This holding is founded upon the Florida Constitution and Florida's long history of requiring jury unanimity in finding all the elements of the offense to be proven; and it gives effect to our precedent that the "final decision in the weighing process must be supported by 'sufficient competent evidence in the record.' " Ford v. State, 802 So. 2d 1121, 1134 (Fla. 2001) (quoting Campbell v. State, 571 So. 2d 415, 420 (Fla. 1990), receded from on other grounds by Trease v.

---

8.  Mitigating circumstances need only be established by a preponderance of the evidence, Diaz v. State, 132 So. 3d 93, 117 (Fla. 2013), and may include any aspect of the defendant's character or background that is proffered as a basis for a sentence less than death.  See Lockett v. Ohio, 438 U.S. 586, 604 (1978); § 921.141(6)(h), Fla. Stat. (2012).

<u>State</u>, 768 So. 2d 1050, 1055 (Fla. 2000)). As we explain, we also find that in order for a death sentence to be imposed, the jury's recommendation for death must be unanimous. This recommendation is tantamount to the jury's verdict in the sentencing phase of trial; and historically, and under explicit Florida law, jury verdicts are required to be unanimous.

The right to a unanimous jury in English jurisprudence has roots reaching back centuries, as evidenced by Sir William Blackstone in his <u>Commentaries on the Laws of England</u>, originally published from 1765 through 1769. There he stated, "But the founders of the English law have with excellent forecast contrived that no man should be called to answer to the king for any capital crime unless upon the preparatory accusation of twelve or more of his fellow-subjects, the grand jury; and that the truth of every accusation . . . should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours." 4 W. Blackstone, <u>Commentaries on the Laws of England</u>, 349-50 (Rees Welsh & Co. ed. 1898).[9]

---

9. In <u>Blakely</u>, the Court also remarked on this history, stating:

This case requires us to apply the rule we expressed in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000): "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." This rule reflects two longstanding tenets of common-law criminal jurisprudence: that the "truth of every accusation" against a defendant "should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours," and that "an accusation which lacks any particular fact

The right to trial by jury was brought from England to this country by those who emigrated here "as their birthright and inheritance, as part of that admirable common law which had fenced around and interposed barriers on every side against the approaches of arbitrary power." Duncan v. Louisiana, 391 U.S. 145, 154 & n.21 (1968) (quoting Thompson v. Utah, 170 U.S. 343, 349-50 (1898)).

In the Florida Constitution of 1838, article I, section 10, of the Declaration of Rights enshrined in Florida law the right to trial by jury in criminal cases. Article I, section 6, further guaranteed that the "right of trial by jury shall forever remain inviolate." Art. I, § 6, Fla. Const. (1838). That right now resides in article I, section 22, of the Florida Constitution, which continues to provide that "[t]he right of trial by jury shall be secure to all and remain inviolate." Art. I, § 22, Fla. Const.

The principle that, under the common law, jury verdicts shall be unanimous was recognized by this Court very early in Florida's history in Motion to Call Circuit Judge to Bench, 8 Fla. 459, 482 (1859). In the 1885 Constitution, the right to trial by jury was given even more protection by the promise that "[t]he right of

---

which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and it is no accusation in reason," 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872). These principles have been acknowledged by courts and treatises since the earliest days of graduated sentencing; . . .

Blakely, 542 U.S. at 301-02 (footnote and citation omitted).

- 25 -

trial by jury shall be secured to all, and remain inviolate forever." Declaration of Rights, § 3, Fla. Const. (1885). And, in 1894, this Court again recognized that in a criminal prosecution, the jury must return a unanimous verdict. Grant v. State, 14 So. 757, 758 (Fla. 1894). In 1911, this Court confirmed the unanimity requirement in Ayers v. State, 57 So. 349, 350 (Fla. 1911), stating that "[o]f course, a verdict must be concurred in by the unanimous vote of the entire jury." Almost half a century later, in Jones v. State, 92 So. 2d 261 (Fla. 1956), again acknowledging that "[i]n this state, the verdict of the jury must be unanimous," this Court held that any interference with the right to a unanimous jury verdict denies the defendant a fair trial as guaranteed by the Declaration of Rights of the Florida Constitution.[10] Id. at 261 (On Rehearing Granted). Thus, Florida has always required jury verdicts to be unanimous on the elements of criminal offenses.

In capital cases, Florida's early laws also indicate that jurors controlled which defendants would receive death. When Florida was still a territory, the penalty for defendants convicted of murder was death by hanging. See Acts of the Legislative Council of the Territory of Florida, An Act for the Apprehension of

---

10. The right to a unanimous jury verdict is incorporated in Florida Rule of Criminal Procedure 3.440 ("No verdict may be rendered unless all of the trial jurors concur in it."). The Florida Standard Jury Instructions for Criminal Cases also state in pertinent part, "This verdict must be unanimous, that is, all of you must agree to the same verdict." Fla. Std. Jury Instr. (Crim.) 3.12 Verdict.

Criminals, and the Punishment of Crimes and Misdemeanors, § 21 (1822). Under this type of mandatory statute, the jury's factual findings on the elements of the crime also necessarily served as the elements necessary for imposition of a sentence of death. In later holding such mandatory capital sentencing provisions unconstitutional, the Supreme Court in Woodson v. North Carolina, 428 U.S. 280, 293 (1976), observed that since the 1700s American juries had refused to convict defendants where the automatic consequence of their conviction was death.

In 1849, the Court noted in Holton v. State, 2 Fla. 476, 478 (1849), that "the jury elected, tried and sworn in this cause came into court, and rendered the following verdict: 'That the said Thomas J. Holton is guilty of murder, in manner and form as in the indictment against him is alleged,' and concluded by recommending the prisoner to mercy." Florida law later expressly provided a mechanism by which the jury could grant mercy in a capital case and assure a life sentence, stating, "Whoever is convicted of a capital offence, and recommended to the mercy of the court by a majority of the jury in their verdict, shall be sentenced to imprisonment in the State prison for life." See A Digest of the Laws of the State of Florida, from the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive,

§ 19 (McClellan Compilation, 1881).[11] Thus, historically, it was the finding by the jury of all the elements necessary for conviction of murder that subjected the defendant to the ultimate penalty, unless mercy was expressed in the verdict of the jury as allowed by law.

Florida repealed its mandatory death sentencing provision in 1972 in an attempt to comply with Furman v. Georgia, 408 U.S. 238 (1972), in which arbitrary and capricious capital sentencing was found unconstitutional. The Legislature, in regular and special session, amended section 921.141, Florida Statutes (1972), to provide for consideration of aggravating and mitigating circumstances before a death sentence could be imposed.[12] "Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 189 (1976). Accordingly, the Supreme Court has made clear that individualized sentencing is required in which the discretion of the jury and the judge in imposing the death penalty will be narrowly channeled, and in which the circumstances of the offense, the character

---

11. Ch. 1877, Laws of Fla. (1872).

12. See ch. 72-72, § 1, at 241, Laws of Fla.; ch. 72-724, § 9, at 20, Laws of Fla. (special session amendments).

and record of the defendant, and any evidence of mitigation that may provide a basis for a sentence less than death must be a part of the sentencing decision. Id.; see also Roper v. Simmons, 543 U.S. 551, 568 (2005) (capital punishment must be limited to a narrow category of the most serious crimes and offenders); Lockett, 438 U.S. at 604 (a defendant may raise as mitigation any aspect of character, record, or circumstances of the offense that may be proffered as a basis for a sentence less than death).[13]

In an effort to meet these requirements for individualized sentencing that narrows the class of murders and murderers for which the death penalty is appropriate, Florida has required the jury to consider evidence of aggravating factors concerning the circumstances of the crime, as well as evidence of mitigating circumstances that a jury may find renders the death penalty inappropriate for an individual defendant in a specific case. These findings are necessary because, as the Supreme Court has explained, "Given that the imposition of death by public authority is so profoundly different from all other penalties, we

---

13. It is not necessary for our analysis to conclude that a right to individualized sentencing existed in the law at the time Florida became a state. It is sufficient for our analysis that individualized sentencing in capital cases is now the law of the land. See, e.g., Gregg, 428 U.S. at 189. It is also sufficient for our analysis that juries in Florida have always been required to be unanimous in finding the elements of the crime, which we now know encompass all the critical findings necessary for imposition of a death sentence.

cannot avoid the conclusion that an individualized decision is essential in capital cases." Lockett, 438 U.S. at 605. Since 1972, until the Supreme Court's ruling in Hurst v. Florida, it has been the Florida judge who ultimately makes his or her own determination of the existence of the aggravating factors, the evidence of mitigation, and the weight to be given each in the sentencing decision before a sentence of death could be imposed.

The Supreme Court in Hurst v. Florida has now made clear that the critical findings necessary for imposition of a sentence of death are the sole province of the jury. And because these findings occupy a position on par with elements of a greater offense, we conclude that all these findings necessary for the imposition of a sentence of death must be made by the jury—as are all elements—unanimously. We are mindful that a plurality of the United States Supreme Court, in a non-capital case, decided that unanimous jury verdicts are not required in all cases under the Sixth Amendment to the United States Constitution. See Apodaca v. Oregon, 406 U.S. 404 (1972) (plurality opinion).[14] However, this Court, in interpreting the Florida Constitution and the rights afforded to persons within this State, may require more protection be afforded criminal defendants than that

---

14. Nonetheless, unanimous juries have been required by the Supreme Court in the case of six-person state juries. See Burch v. Louisiana, 441 U.S. 130, 137-38 (1979).

mandated by the federal Constitution. This is especially true, we believe, in cases where, as here, Florida has a longstanding history requiring unanimous jury verdicts as to the elements of a crime. We recently explained:

> Unless the Florida Constitution specifies otherwise, this Court, as the ultimate arbiter of the meaning and extent of the safeguards and fundamental rights provided by the Florida Constitution, may interpret those rights as providing greater protections than those in the United States Constitution. State v. Kelly, 999 So. 2d 1029, 1042 (Fla. 2008). Put simply, the United States Constitution generally sets the "floor"—not the "ceiling"—of personal rights and freedoms that must be afforded to a defendant by Florida law. Id. As we explained in Kelly, "we have the duty to independently examine and determine questions of state law so long as we do not run afoul of federal constitutional protections or the provisions of the Florida Constitution that require us to apply federal law in state-law contexts." 999 So. 2d at 1043 (emphasis in original). Our Court reemphasized what we previously stated in Traylor: "[w]hen called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein." Id. at 1044 (quoting Traylor, 596 So. 2d at 962-63).

State v. Horwitz, 191 So. 3d 429, 438 (Fla. 2016) (footnote omitted).

Hurst v. Florida mandates that all the findings necessary for imposition of a death sentence are "elements" that must be found by a jury, and Florida law has long required that jury verdicts must be unanimous. Accordingly, we reiterate our holding that before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the

- 31 -

aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death. We equally emphasize that by so holding, we do not intend to diminish or impair the jury's right to recommend a sentence of life even if it finds aggravating factors were proven, were sufficient to impose death, and that they outweigh the mitigating circumstances. See Brooks v. State, 762 So. 2d 879, 902 (Fla. 2000). As the relevant jury instruction states: "Regardless of your findings . . . you are neither compelled nor required to recommend a sentence of death." Fla. Std. Jury Instr. (Crim.) 7.11 Penalty Proceedings—Capital Cases. Once these critical findings are made unanimously by the jury, each juror may then "exercis[e] reasoned judgment" in his or her vote as to a recommended sentence. See Henyard v. State, 689 So. 2d 239, 249 (Fla. 1996) (quoting Alvord v. State, 322 So. 2d 533, 540 (Fla. 1975)). Nor do we intend by our decision to eliminate the right of the trial court, even upon receiving a unanimous recommendation for death, to impose a sentence of life.

In requiring jury unanimity in these findings and in its final recommendation if death is to be imposed, we are cognizant of significant benefits that will further the administration of justice. Supreme Court Justice Anthony Kennedy, while a judge on the Ninth Circuit Court of Appeals, noted the salutary benefits of the unanimity requirement on jury deliberations as follows:

> The dynamics of the jury process are such that often only one or two members express doubt as to [the] view held by a majority at the

outset of deliberations. A rule which insists on unanimity furthers the deliberative process by requiring the minority view to be examined and, if possible, accepted or rejected by the entire jury. The requirement of jury unanimity thus has a precise effect on the fact-finding process, one which gives particular significance and conclusiveness to the jury's verdict.

United States v. Lopez, 581 F.2d 1338, 1341 (9th Cir. 1978). That court further noted that "[b]oth the defendant and society can place special confidence in a unanimous verdict." Id. Comparing the unanimous jury requirement to the requirement for proof beyond a reasonable doubt, the Fifth Circuit Court of Appeals stated, "the unanimous jury requirement 'impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue.' " United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977).

Further, it has been found based on data that "behavior in juries asked to reach a unanimous verdict is more thorough and grave than in majority-rule juries, and that the former were more likely than the latter jurors to agree on the issues underlying their verdict. Majority jurors had a relatively negative view of their fellow jurors' openmindedness and persuasiveness." See Elizabeth F. Loftus & Edith Greene, Twelve Angry People: The Collective Mind of the Jury, 84 Colum. L. Rev. 1425, 1428 (1984). Another study disclosed that capital jurors work especially hard to evaluate the evidence and reach a unanimous verdict where they can find agreement. See Scott E. Sundby, War & Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings L.J. 103 (2010). Unanimous-verdict

juries tend to be more evidence driven, generally delaying their first vote until the evidence has been discussed.  See Kate Riordan, Ten Angry Men: Unanimous Jury Verdicts in Criminal Trials and Incorporation After McDonald, 101 J. Crim. L. & Criminology 1403, 1429 (2011).  Further, juries not required to reach unanimity tend to take less time deliberating and cease deliberating when the required majority vote is achieved rather than attempting to obtain full consensus; and jurors operating under majority rule express less confidence in the justness of their decisions.  See, e.g., Kim Taylor-Thompson, Empty Votes in Jury Deliberations, 113 Harv. L. Rev. 1261, 1272-73 (2000).  All these principles would apply with even more gravity, and more significance, in capital sentencing proceedings.  We also note that the requirement of unanimity in capital jury findings will help to ensure the heightened level of protection necessary for a defendant who stands to lose his life as a penalty.

In the past, we expressed our view that unanimity in capital sentencing was necessary in Steele, 921 So. 2d 538.  There, based on established precedent, we were constrained to find that the jury was not required to report its findings on an interrogatory verdict.  See id. at 548.  Nevertheless, we urged the Florida Legislature to take action to require at least some unanimity by the jury in capital penalty proceedings.  We explained:

> Many courts and scholars have recognized the value of unanimous verdicts.  For example, the Connecticut Supreme Court has stated:

[W]e perceive a special need for jury unanimity in capital sentencing. Under ordinary circumstances, the requirement of unanimity induces a jury to deliberate thoroughly and helps to assure the reliability of the ultimate verdict. The "heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate"; Sumner v. Shuman, 483 U.S. 66 (1987); convinces us that jury unanimity is an especially important safeguard at a capital sentencing hearing. In its death penalty decisions since the mid–1970s, the United States Supreme Court has emphasized the importance of ensuring reliable and informed judgments. These cases stand for the general proposition that the "reliability" of death sentences depends on adhering to guided procedures that promote a reasoned judgment by the trier of fact. The requirement of a unanimous verdict can only assist the capital sentencing jury in reaching such a reasoned decision.

Id. at 549 (quoting State v. Daniels, 542 A.2d 306, 315 (Conn. 1988) (some citations omitted)); see also Coday v. State, 946 So. 2d 988, 1022 (Fla. 2006) (Pariente, J., concurring in part and dissenting in part) (reiterating this Court's suggestion to the Legislature to revise the capital sentencing statute to require unanimity in jury findings and recommendations).

Based on the foregoing, we conclude that under the commandments of Hurst v. Florida, Florida's state constitutional right to trial by jury, and our Florida jurisprudence, the penalty phase jury must be unanimous in making the critical findings and recommendation that are necessary before a sentence of death may be considered by the judge or imposed.

### III.  THE EIGHTH AMENDMENT

In addition to the requirements of unanimity that flow from the Sixth Amendment and from Florida's right to trial by jury, we conclude that juror unanimity in any recommended verdict resulting in a death sentence is required under the Eighth Amendment.  Although the United States Supreme Court has not ruled on whether unanimity is required in the jury's advisory verdict in capital cases, the foundational precept of the Eighth Amendment calls for unanimity in any death recommendation that results in a sentence of death.  That foundational precept is the principle that death is different.[15]  This means that the penalty may not be arbitrarily imposed, but must be reserved only for defendants convicted of the most aggravated and least mitigated of murders.[16]  Accordingly, any capital sentencing law must adequately perform a narrowing function in order to ensure that the death penalty is not being arbitrarily or capriciously imposed.  See Gregg,

---

15.  See, e.g., Lockett v. Ohio, 438 U.S. 586, 604 (1978) (finding there is a "qualitative difference" between death and other penalties requiring "a greater degree of reliability when the death sentence is imposed"); Gregg, 428 U.S. at 187-88 (stating that "death is different in kind" and as a punishment is "unique in its severity and irrevocability"); Furman, 408 U.S. at 286 (Brennan, J., concurring) ("Death is a unique punishment in the United States.").

16.  "As we have stated time and again, death is a unique punishment. Accordingly, the death penalty must be limited to the most aggravated and least mitigated of first-degree murders." Larkins v. State, 739 So. 2d 90, 92-93 (Fla. 1999) (citations omitted).

428 U.S. at 199. The Supreme Court subsequently explained in <u>McCleskey v. Kemp</u> that "the Court has imposed a number of requirements on the capital sentencing process to ensure that capital sentencing decisions rest on the individualized inquiry contemplated in <u>Gregg</u>." <u>McCleskey</u>, 481 U.S. 279, 303 (1987). This individualized sentencing implements the required narrowing function that also ensures that the death penalty is reserved for the most culpable of murderers and for the most aggravated of murders. If death is to be imposed, unanimous jury sentencing recommendations, when made in conjunction with the other critical findings unanimously found by the jury, provide the highest degree of reliability in meeting these constitutional requirements in the capital sentencing process.

As we hold in this case, the unanimous finding of the aggravating factors and the fact they are sufficient to impose death, as well as the unanimous finding that they outweigh the mitigating circumstances, all serve to help narrow the class of murderers subject to capital punishment. However, the further requirement that a jury must unanimously recommend death in order to make a death sentence possible serves that narrowing function required by the Eighth Amendment even more significantly, and expresses the values of the community as they currently relate to imposition of death as a penalty.

The Supreme Court has described the jury as a "significant and reliable objective index of contemporary values." Gregg, 428 U.S. at 181. Requiring unanimous jury recommendations of death before the ultimate penalty may be imposed will ensure that in the view of the jury—a veritable microcosm of the community—the defendant committed the worst of murders with the least amount of mitigation. This is in accord with the goal that capital sentencing laws keep pace with "evolving standards of decency." Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion) (holding that the Eighth Amendment must "draw its meaning from the evolving standards of decency that mark the progress of a maturing society.").

The "evolving standards" test considers whether punishments that were within the power of the state to impose at the time, but have since come to be viewed as unconstitutional, should be prohibited on constitutional grounds. See Montgomery v. Louisiana, 136 S. Ct. 718, 742 (2016) (describing the "evolving standards of decency" test in evaluating the retroactive application of Miller v. Alabama, 132 S. Ct. 2455, 2475 (2012), which held that mandatory sentences of life without parole for juveniles are unconstitutional). This evolving standards test also helps to ensure that "the State's power to punish is exercised within the limits of civilized standards." Woodson v. North Carolina, 428 U.S. 280, 288 (1976) (quoting Trop, 356 U.S. at 100). "[A] jury that must choose between life

imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." Witherspoon v. Illinois, 391 U.S. 510, 519 (1968).

The Supreme Court in Powers v. Ohio, 499 U.S. 400 (1991), a case holding that prosecutors cannot strike jurors based on their race, quoted Alexis de Tocqueville on the significance of the jury to the direction of society, stating: "[T]he institution of the jury raises the people itself, or at least a class of citizens, to the bench of judicial authority [and] invests the people, or that class of citizens, with the direction of society." Powers, 499 U.S. at 407 (quoting Alexis de Tocqueville, 1 Democracy in America 334-37 (Schocken 1st ed. 1961)). This "direction of society" that is invested in the jury is also reflected in the capital sentencing laws of the majority of states that still impose the death penalty.

In failing to require a unanimous recommendation for death as a predicate for possible imposition of the ultimate penalty, Florida has been a clear outlier. Of the states that have retained the death penalty, Florida is one of only three that does not require a unanimous jury recommendation for death.[17] Additionally, federal

---

17. The Delaware Supreme Court recently declared that state's capital sentencing law unconstitutional under the Sixth Amendment because it failed to require the jury to unanimously find all the aggravating circumstances to be weighed, and because the Sixth Amendment requires the jury, not the judge, to find that the aggravating circumstances outweigh the mitigating circumstances. This latter finding was, under Delaware law, "the critical finding upon which the

- 39 -

law requires the jury's recommendation for death in a capital case to be unanimous. See 18 U.S.C. § 3593(e); Fed. R. Crim. P. 31(a). The Supreme Court reiterated that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." Atkins v. Virginia, 536 U.S. 304, 312 (2002) (quoting Penry v. Lynaugh, 492 U.S. 302, 331 (1989) (abrogated on other grounds in Atkins, 536 U.S. at 321)). The vast majority of capital sentencing laws enacted in this country provide the clearest and most reliable evidence that contemporary values demand a defendant not be put to death except upon the unanimous consent of the jurors who have deliberated upon all the evidence of aggravating factors and mitigating circumstances. By requiring unanimity in a recommendation of death in order for death to be considered and imposed, Florida will achieve the important goal of bringing its capital sentencing laws into harmony with the direction of society reflected in all these states and with federal law.

Moreover, Florida's capital sentencing law will comport with these Eighth Amendment principles in order to more surely protect the rights of defendants guaranteed by the Florida and United States Constitutions. When all jurors must agree to a recommendation of death, their collective voice will be heard and will

---

sentencing judge 'shall impose a sentence of death.' " See Rauf v. Delaware, 2016 WL 4224252, *1-*2 (Del. Aug. 2, 2016) (quoting 11 Del. C. § 4209).

inform the final recommendation. This means that the voices of minority jurors cannot simply be disregarded by the majority, and that all jurors' views on the proof and sufficiency of the aggravating factors and the relative weight of the aggravating factors to the mitigating circumstances must be equally heard and considered.

There are other pragmatic reasons why Florida's capital sentencing law must require unanimity in a jury recommendation of death before any sentence of death may be considered or imposed by the trial court. When the Supreme Court decided Hurst v. Florida and finally applied Ring to capital sentencing in Florida, it invalidated a portion of Florida's capital sentencing scheme. Since the issuance of Ring almost fifteen years ago, many death row inmates have raised Ring claims in this Court and have been repeatedly rebuffed based on pre-Ring precedent that held the jury was not required to make the critical findings necessary for imposition of the death penalty. Once the Supreme Court made clear in Hurst v. Florida that these findings are the sole province of the jury and that Ring applies to Florida's capital sentencing laws, the Florida Legislature was required to immediately attempt to craft a new sentencing law in accord with Hurst v. Florida. Florida need not face a similar crisis in the future. Requiring a unanimous jury recommendation before death may be imposed, in accord with the precepts of the Eighth Amendment and Florida's right to trial by jury, is a critical step toward

ensuring that Florida will continue to have a constitutional and viable death penalty law, which is surely the intent of the Legislature. This requirement will dispel most, if not all, doubts about the future validity and long-term viability of the death penalty in Florida.[18]

We also note that there is no valid basis for concern that such requirement will allow a single juror with a fixed objection to the death penalty to impede the proper conduct of the penalty phase process. Although a prospective juror who voices only general objections to the death penalty cannot be excluded from the jury on that basis, Guardado v. State, 176 So. 3d 886, 898 (Fla. 2015) (citing Witherspoon, 391 U.S. at 522), a prospective juror may be found unqualified to serve if he or she expresses an unyielding conviction and rigidity toward the death penalty. Conde v. State, 860 So. 2d 930, 939 (Fla. 2003). This Court has made clear that, although a juror's initial response to questioning about the death penalty alone will not automatically provide good cause to remove that juror, a juror's "[p]ersistent equivocation or vacillation . . . on whether he or she can set aside biases or misgivings concerning the death penalty in a capital penalty phase

---

18. As we stated earlier, even if the jurors unanimously find that sufficient aggravating factors were proven beyond a reasonable doubt, and that the aggravators outweigh the mitigating circumstances, the jurors are never required to recommend death. And, even if the jury unanimously recommends a death sentence, the trial court is never required to impose death.

supplies the reasonable doubt as to the juror's impartiality which justifies dismissal." Johnson v. State, 969 So. 2d 938, 947-48 (Fla. 2007). This is in accord with the United States Supreme Court's holding in Wainwright v. Witt, 469 U.S. 412 (1985), that a prospective juror may be excused for cause when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Id. at 433 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

Furthermore, it is presumed that jurors will, in good faith, follow the law as it is explained to them. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)). "[We] presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." Davis v. State, 121 So. 3d 462, 492 (Fla. 2013) (quoting United States v. Olano, 507 U.S. 725, 740-41 (1993) (quoting Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985))). In a capital case, the gravity of the proceeding and the concomitant juror responsibility weigh even more heavily, and it can be presumed that the penalty phase jurors will take special care to understand and follow the law. Thus, there is no basis for concern that requiring a unanimous death recommendation before death may be imposed will allow a single juror, who for personal reasons would under no circumstances vote to

- 43 -

impose capital punishment, to derail the process of meaningful jury deliberation on all the facts concerning aggravating factors and mitigating circumstances, and on the ultimate finding of whether death has been proven to be the appropriate penalty in any individual case.

For all the foregoing reasons, the United States and Florida Constitutions, as well as the administration of justice, are implemented by requiring unanimity in jury verdicts recommending death as a penalty before such a penalty may be imposed.

Because the Supreme Court in Hurst v. Florida held that a portion of Florida's capital sentencing scheme under which Hurst was sentenced to death violated the Sixth Amendment and Hurst's right to critical jury findings, and Hurst v. Florida error occurred in this case, we must next determine if, as Hurst contends, he is entitled to an automatic sentence of life imprisonment without the possibility of parole.

## IV. SECTION 775.082(2), FLORIDA STATUTES

Because the Supreme Court held that a portion of Florida's sentencing scheme that bases imposition of a death sentence on judicial factfinding violates the Sixth Amendment, Hurst and supporting amici contend that section 775.082(2), Florida Statutes (2015), requires this Court to vacate his death sentence and

sentence him to life in prison without the possibility of parole.  That statute

provides:

> (2)  In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1).  No sentence of death shall be reduced as a result of a determination that a method of execution is held to be unconstitutional under the State Constitution or the Constitution of the United States.

§ 775.082(2), Fla. Stat.  This statutory provision was originally passed in the spring

of 1972,[19] in large part in anticipation that the decision in Furman, 408 U.S. 238

(1972), might strike down the death penalty in its entirety.

As support for his position, Hurst cites what occurred after the Supreme

Court issued its decision in Furman on June 29, 1972.  In that case, a plurality of

the Court struck down Georgia and Texas death penalty statutes as violative of the

Eighth and Fourteenth Amendments.  After Furman, the Florida Attorney General

asked this Court to vacate the death sentences of forty death row inmates who were

sentenced under the statute as it existed at the time of Furman and impose life

sentences.  See Anderson v. State, 267 So. 2d 8, 9-10 (Fla. 1972).  This Court

agreed and, pursuant to the motion of the Attorney General, the sentences at issue

---

19. See ch. 72-118, § 1, at 388, Laws of Fla. (effective October 1, 1972).

- 45 -

were commuted to life.  Id. at 9.  However, nowhere in Anderson did this Court construe or express any opinion regarding the meaning of section 775.082(2), in light of the Supreme Court's decision in Furman.  We did state in Anderson, "[a]lthough this Court has never declared the death penalty to be unconstitutional, we nevertheless recognized and followed the concensus [sic] determination of the several opinions rendered by the United States Supreme Court in Furman v. Georgia."  Id. at 9.  We also noted in Anderson that the United States District Court in United States ex rel. Young v. Wainwright, (No. 64-16-Civ.-J-S) (Fla. M.D.), had set aside the death sentences imposed "upon all persons incarcerated in 'Death Row' of the State prison whose cases had terminated," and had retained jurisdiction over other defendants whose cases were still in the appellate process. Anderson, 267 So. 2d at 9.

The one paragraph, per curiam opinion in Furman simply states that in three capital cases—two in Georgia and one in Texas—the "imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.  The judgment in each case is therefore reversed insofar as it leaves undisturbed the death sentence imposed, and the cases are remanded for further proceedings."  Furman, 408 U.S. at 239-40. Five justices filed separate opinions in support of the judgments, and four justices filed dissenting opinions.  It is this multiplicity of separate opinions and the

diversity of views expressed in them that made the true scope of <u>Furman</u> difficult to ascertain.  The views expressed in the many concurring opinions created a level of uncertainty in the state of capital sentencing law after <u>Furman</u>, and thus provided the impetus for the Florida Attorney General to request this Court to impose life sentences on a number of death row inmates.  To illustrate, we recount portions of the <u>Furman</u> concurring opinions here.

Justice Douglas concurred in the judgment and opined that "these discretionary statutes are unconstitutional" mainly because they are discriminatorily applied.  <u>Id.</u> at 256-57 (Douglas, J., concurring).  Justice Brennan concurred in the judgment and concluded that "[t]he punishment of death is therefore 'cruel and unusual,' and the States may no longer inflict it as punishment for crimes."  <u>Id.</u> at 305 (Brennan, J., concurring).  Justice Stewart concurred in <u>Furman</u>, and noted that "at least two of my Brothers have concluded that the infliction of the death penalty is constitutionally impermissible in all circumstances under the Eighth and Fourteenth Amendments."  <u>Id.</u> at 306 (Stewart, J., concurring).  However, he found it unnecessary to reach that question.  Justice White also concurred in <u>Furman</u>, expressing his concern with statutes that delegate to judges or juries the decision of when the penalty will be imposed without mandating any particular kind or class of case in which it should be imposed.  <u>Id.</u> at 311 (White, J., concurring).  Finally, Justice Marshall concurred in <u>Furman</u>, and

noted that the judgments of the Court affected not only the three petitioners but "the almost 600 other condemned men and women in this country currently awaiting execution." Id. at 316 (Marshall, J., concurring). Justice Marshall referred to the Court's decision as "striking down capital punishment" and indicated that the Court was concluding "that the death penalty violates the Eighth Amendment." Id. at 370-71 (Marshall, J., concurring).[20] While it is impossible to glean a consistent ruling from the plurality decisions of the Justices in Furman, it can be seen why the Florida Attorney General asked this Court to vacate a large number of death sentences after Furman was issued, and why, in Anderson, this Court agreed.

The State contends that section 775.082(2) exists only to assure that a life sentence will be imposed on individuals previously sentenced to death if capital

---

20. Comments in the dissents in Furman also added to the uncertainty of the scope of the Furman plurality. Justice Burger, in his dissenting opinion, noted, "The actual scope of the Court's ruling, which I take to be embodied in these concurring opinions, is not entirely clear." Furman, 408 U.S. at 397 (Burger, J., dissenting). He also commented that because there was no majority of the Court on the ultimate issue, "the future of capital punishment in this country has been left in an uncertain limbo." Id. at 403 (Burger, J., dissenting). Justice Blackmun, in his dissent, stated, "The Court has just decided that it is time to strike down the death penalty." Id. at 408 (Blackmun, J., dissenting). He also referred to the Court's action as "abolish[ing] capital punishment as heretofore known in this country." Id. at 461 (Blackmun, J., dissenting). Justice Rehnquist, in his dissenting opinion, referred to the Court's judgments as "strik[ing] down a penalty . . . [long] thought necessary." Id. at 465 (Rehnquist, J., dissenting).

punishment as a penalty is declared unconstitutional generally or for any given capital offense.  Indeed, the death penalty has, for several types of crimes and individuals, been declared categorically unconstitutional.  See, e.g., Atkins v. Virginia, 536 U.S. 304 (2002) (holding capital punishment for intellectually disabled persons is unconstitutional); Coker v. Georgia, 433 U.S. 584 (1977) (holding capital punishment as a penalty for raping an adult woman violates the Eighth Amendment).  We agree with the State.

When section 775.082(2) is viewed in the context of this State's response to the plurality opinion in Furman, and in light of the fact that Furman was based on Eighth and Fourteenth Amendment principles, we conclude that the statute does not mandate automatic commutation to life sentences after the decision in Hurst v. Florida.  Hurst v. Florida was decided on Sixth Amendment grounds and nothing in that decision suggests a broad indictment of the imposition of the death penalty generally.  Ring was also decided on Sixth Amendment grounds, and that decision did not require the state court to vacate all death sentences and enter sentences of life and did not address the range of conduct that a state may criminalize.  After Hurst v. Florida, the death penalty still remains the ultimate punishment in Florida, although the Supreme Court has now required that all the critical findings necessary for imposition of the death penalty be transferred to the jury.

There is no indication in the <u>Hurst v. Florida</u> decision that the Supreme Court intended or even anticipated that all death sentences in Florida would be commuted to life, or that death as a penalty is categorically prohibited. Moreover, the text of section 775.082(2) refers to the occasion that "the death penalty" is held to be unconstitutional to determine when, and if, automatic sentences of life must be imposed. This provision is intended to provide a "fail safe" sentencing option in the event that "the death penalty"—as a penalty—is declared categorically unconstitutional.[21]

The Supreme Court in <u>Hurst v. Florida</u> focused its decision on that portion of the capital sentencing process requiring a judge rather than a jury to make all the findings critical to the imposition of the death penalty. The Court did not declare

---

21. Our construction of section 775.082(2) is supported by historical records concerning this legislation at the time it was being considered by the Legislature. For example, in a September 13, 1971, letter from then-Attorney General Robert L. Shevin to Senator David McClain, who introduced Senate Bill 153 which enacted the statutory language at issue, the Attorney General stated, "I have read with interest your prefiled bill to amend the State's death penalty statute to provide life imprisonment if the Supreme Court of the United States bans the death penalty." (Available at Fla. Dep't of State, Div. of Archives, Tallahassee, Fla., Series 19, Box 458). Within those same records appears a report titled "Subject: SB 153 by McCLAIN declaring that persons sentenced to death shall, if the death penalty is ruled unconstitutional, be sentenced to life imprisonment." In that memorandum, it is also stated, "The death penalty is currently being considered by the Supreme Court. If it is declared unconstitutional, some disposition will need to be made of persons who are currently under a death sentence." <u>Id.</u> The memorandum further states, "Assuming that capital punishment is held unconstitutional, life imprisonment would still be a constitutional means of punishment." <u>Id.</u>

the death penalty unconstitutional. Accordingly, we hold that section 775.082(2) does not require commutation to life under the holding of Hurst v. Florida, which did not invalidate death as a penalty, but invalidated only that portion of the process which had allowed the necessary factfinding to be made by the judge rather than the jury in order to impose a sentence of death. Because Hurst is not entitled to have his sentence automatically commuted to life in prison without the possibility of parole, we turn to the issue of whether the error in sentencing Hurst that was identified by the United States Supreme Court is harmless beyond a reasonable doubt.

## V. HARMLESS ERROR ANALYSIS

In its decision finding that portions of Florida's sentencing scheme violate the Sixth Amendment because the factfinding necessary for imposition of a death sentence is entrusted to the judge and not the jury, the Supreme Court expressly declined to reach the question of whether the error was harmless in Hurst's case. The Court stated, "Finally, we do not reach the State's assertion that any error was harmless. This Court normally leaves it to state courts to consider whether an error is harmless, and we see no reason to depart from that pattern here." Hurst, 136 S. Ct. at 624 (citation omitted). This was the same procedure followed in Ring, where the Supreme Court also declined to reach the question of harmless error, but left that question to the state court to pass on in the first instance. 536 U.S. at 609

n.7. Accordingly, we examine the contention of the State that the error in this case was harmless beyond a reasonable doubt.

Hurst contends that harmless error review cannot apply at all because the error identified by the Supreme Court in this case is structural—that is, error that is per se reversible because it results in a proceeding that is always fundamentally unfair.[22] He contends that even if harmless error review is allowed, the Hurst v. Florida error cannot be quantified or assessed in a harmless error review in this case because the record is silent as to what any particular juror, much less a unanimous jury, actually found. We conclude that the error that occurred in Hurst's sentencing proceeding, in which the judge rather than the jury made all the necessary findings to impose a death sentence, is not structural error incapable of harmless error review. Nevertheless, here, we agree that the error in Hurst's penalty phase proceeding was not harmless beyond a reasonable doubt.

The Supreme Court has explained: "Since this Court's landmark decision in Chapman v. California, 386 U.S. 18 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction,

---

22. Structural error has been described as follows: "Only the rare type of error—in general, one that 'infect[s] the entire trial process' and 'necessarily render[s] [it] fundamentally unfair'—requires automatic reversal." Glebe v. Frost, 135 S. Ct. 429, 430-31 (2014) (quoting Neder v. United States, 527 U.S. 1, 8 (1999)).

the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless." Arizona v. Fulminante, 499 U.S. 279, 306 (1991). In Neder v. United States, 527 U.S. 1, 7-8 (1999), the Supreme Court held that structural error can occur in "only a 'very limited class of cases,' " and is error that always makes the trial fundamentally unfair. Where an element of the offense was erroneously not submitted to the jury in Neder, the Court found harmless error review applied and that such an error "differs markedly from the constitutional violations we have found to defy harmless-error review." Id. at 8.

More recently, in Washington v. Recuenco, 548 U.S. 212, 218-19 (2006), the Supreme Court held in a noncapital case that failure to submit a sentencing factor to the jury in violation of Apprendi, Blakely, and the Sixth Amendment was not structural error that would always result in reversal. On this same issue, we explained in Galindez v. State:

> Because the question of Apprendi/Blakely error also involved judicial factfinding versus jury factfinding, the Court concluded that the harmless error analysis applied in Neder also applied to the error in Recuenco. Id. In Neder, the Court framed the test as follows: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" Neder, 527 U.S. at 18. The Court concluded that the same harmless error analysis developed in Chapman v. California, 386 U.S. 18 (1967), and applied in cases concerning the erroneous admission of evidence under the Fifth and Sixth Amendments, also applied to infringement of the jury's factfinding role under the Sixth Amendment. Neder, 527 U.S. at 18. The [Supreme] Court explained that

a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is "no," holding the error harmless does not "reflec[t] a denigration of the constitutional rights involved." Rose[ v. Clark], 478 U.S. [570, 577 (1986)].

Galindez v. State, 955 So. 2d 517, 522 (2007) (emphasis added) (quoting Neder, 527 U.S. at 19).

Having concluded that Hurst v. Florida error is capable of harmless error review, we must now conduct a harmless error analysis under Florida law. Following the harmless error principles announced in Chapman, we set forth the test for harmless error review in Florida in State v. DiGuilio, stating:

> The harmless error test, as set forth in Chapman and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986). Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000). Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," DiGuilio, 491 So. 2d at 1137, and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a

Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Justice Alito, in his dissent in Hurst v. Florida, opined that the error was harmless beyond a reasonable doubt because, in his view, "it defies belief to suggest that the jury would not have found the existence of either aggravating factor if its finding was binding." Hurst v. Florida, 136 S. Ct. at 626 (Alito, J., dissenting). Despite Justice Alito's confidence on this point, after a detailed review of the evidence presented as proof of the aggravating factors and evidence of substantial mitigation, we are not so sanguine as to conclude that Hurst's jury would without doubt have found both aggravating factors—and, as importantly, that the jury would have found the aggravators sufficient to impose death and that the aggravating factors outweighed the mitigation. The jury recommended death by only a seven to five vote, a bare majority. Because there was no interrogatory

verdict, we cannot determine what aggravators, if any, the jury unanimously found proven beyond a reasonable doubt. We cannot determine how many jurors may have found the aggravation sufficient for death. We cannot determine if the jury unanimously concluded that there were sufficient aggravating factors to outweigh the mitigating circumstances. Nevertheless, the fact that only seven jurors recommended death strongly suggests to the contrary.

We are fully aware of the brutal actions that resulted in the murder in this case. The evidence of the circumstances surrounding this murder can be considered overwhelming and essentially uncontroverted. However, the harmless error test is not limited to consideration of only the evidence of aggravation, and it is not an "overwhelming evidence" test. The record in this case demonstrated that the evidence of mitigation was extensive and compelling. Hurst was slow mentally while growing up and did poorly in school. He had difficulty caring for himself and performing normal daily activities. Experts presented evidence of brain abnormalities in multiple areas of his brain. Hurst's IQ testing showed scores dipping into the intellectually disabled range, although he had scored higher on occasion. Because we do not have an interrogatory verdict commemorating the findings of the jury, we cannot say with any certainty how the jury viewed that mitigation, although we do know that the jury recommended death by only a bare majority. The trial judge found that Hurst's young chronological age of 19, and his

even younger mental age, at the time of the murder was mitigating. The judge also found that Hurst had significant mental mitigation including low IQ and likely brain abnormalities due to fetal alcohol syndrome.

It is noteworthy that after Ring, the Arizona Supreme Court did not find the Ring error to be structural, but did a rigorous harmless error review. State v. Ring, 65 P.3d 915, 933 (Ariz. 2003). The Arizona court held that Arizona's statutes required more than the presence of one or more statutorily defined aggravating factors. Thus, the Arizona court explained, "Because a trier of fact must determine whether mitigating circumstances call for leniency, we will affirm a capital sentence only if we conclude, beyond a reasonable doubt, that no rational trier of fact would determine that the mitigating circumstances were sufficiently substantial to call for leniency. If we cannot reach that conclusion, we must find reversible error and remand the case for resentencing." Id. at 946. Thus, the Arizona court concluded that the review must extend to the mitigation and to the weighing decision, and that it would affirm a capital sentence on harmless error review only if it found "beyond a reasonable doubt, that no rational trier of fact would determine that the mitigating circumstances were sufficiently substantial to call for leniency." Id.

In Hurst's case, we cannot find beyond a reasonable doubt that no rational jury, as the trier of fact, would determine that the mitigation was "sufficiently

substantial" to call for a life sentence.  Nor can we say beyond a reasonable doubt there is no possibility that the Hurst v. Florida error in this case contributed to the sentence.  We decline to speculate as to why seven jurors in this case recommended death and why five jurors were persuaded that death was not the appropriate penalty.  To do so would be contrary to our clear precedent governing harmless error review.  Thus, the error in Hurst's sentencing has not been shown to be harmless beyond a reasonable doubt.

## VI.  CONCLUSION

Because the death sentence was imposed on Hurst in violation of the Sixth Amendment right to a jury determination of every critical finding necessary for imposition of the death sentence, and because we conclude that the error is not harmless beyond a reasonable doubt under the facts and circumstances of this case, we vacate Hurst's death sentence and remand for a new penalty phase proceeding consistent with this opinion.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which LABARGA, C.J., concurs.
PERRY, J., concurs in part and dissents in part with an opinion.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

If "death is different," as this Court and the United States Supreme Court have repeatedly pronounced,[23] then requiring unanimity in the jury's final recommendation of life or death is an essential prerequisite to the continued constitutionality of the death penalty in this State. I fully concur with the majority in requiring that, before a sentence of death may be constitutionally imposed, the jury must find unanimously the existence of any aggravating factor, that the aggravating factors are sufficient for the imposition of death, that the aggravating factors outweigh the mitigating circumstances, and finally the recommendation for death. See majority op. at 23-24. I write separately to emphasize the historical foundations for this Court's holding requiring unanimity in the jury's final recommendation of death under Florida's constitutional right to jury trial, guaranteed by article I, section 22, of the Florida Constitution.

I also agree with the majority that the Eighth Amendment further buttresses the conclusion that a jury must unanimously recommend death. Simply put, Florida's extreme outlier status in not requiring unanimity in the jury's final recommendation renders the current imposition of the death penalty in Florida

---

23. See Yacob v. State, 136 So. 3d 539, 546 (Fla. 2014) (quoting Fitzpatrick v. State, 527 So. 2d 809, 811 (Fla. 1988)); Miller v. Alabama, 132 S. Ct. 2455, 2470 (2012).

cruel and unusual under the Eighth Amendment to the United States Constitution. Additionally, as the majority notes, resolving this issue now, as opposed to later, ensures that, for as long as death is a permissible punishment in the United States, Florida's death penalty will be constitutionally sound. See majority op. at 41-42.

Lastly, I write to address the dissent's argument that this Court has exceeded the scope of the remand proceeding from the United States Supreme Court.

### Right to Jury Trial Under the Florida Constitution

"[A] defendant's right to a jury trial is indisputably one of the most basic rights guaranteed by our constitution." State v. Griffith, 561 So. 2d 528, 530 (Fla. 1990). As the majority detailed, unanimity in jury verdicts has been the polestar of Florida's criminal justice system since our State's first Constitution in 1838. Majority op. at 25. Likewise, this Court has "always considered the right to jury trial an indispensable component of our system of justice." Blair v. State, 698 So. 2d 1210, 1213 (Fla. 1997). In Florida, "the requirement of unanimity has been scrupulously honored in the criminal law of this state for any finding of guilt and for any fact that increases the maximum punishment." Butler v. State, 842 So. 2d 817, 837 (Fla. 2003) (Pariente, J., concurring in part, dissenting in part); see also In re Std. Jury Instrs. in Crim. Cases—Report No. 2011-05, 141 So. 3d 132, 138 (Fla. 2013) ("Your verdict finding the defendant either guilty or not guilty must be unanimous."). The history of the constitutional right to jury trial in Florida

supports the majority's determination that Florida's constitutional right to a trial by jury requires unanimity in the jury's final and ultimate recommendation: whether the defendant shall live or die.

The right to a trial by jury is not a right to trial by individual jurors. As the majority explains, when considering its functional qualities, a unanimity requirement "furthers the deliberative process by requiring the minority view to be examined and, if possible, accepted or rejected by the <u>entire</u> jury." Majority op. at 33 (quoting <u>United States v. Lopez</u>, 581 F.2d 1338, 1341 (9th Cir. 1978)) (emphasis added). Requiring unanimity also ensures that every juror's voice, with their attendant backgrounds, is heard and considered. "Unanimous verdicts [] protect jury representativeness—each point of view must be considered and all jurors persuaded. [In fact, s]tudies have shown that minority jurors participate more actively when decisions must be unanimous." <u>Principles for Juries and Jury Trials</u>, SM078 ALI-ABA 753, 782 (2007) (citing Valerie P. Hans, <u>The Power of Twelve: The Impact of Jury Size and Unanimity on Civil Jury Decision Making</u>, 4 Del. L. Rev. 2, 23 (2001)). A unanimous verdict also "gives particular significance and conclusiveness to the jury's verdict." <u>Lopez</u>, 581 F.2d at 1341; <u>see also</u> majority op. at 33. Additionally, "[u]nanimous-verdict juries . . . tend to be more evidence-driven, generally delaying their first votes until the evidence has been discussed." Kate Riordan, <u>Ten Angry Men: Unanimous Jury Verdicts in Criminal</u>

Trials and Incorporation After McDonald, 101 J. Crim. L. & Criminology 1403, 1429 (2011).  As former Justice Raoul Cantero has explained, "Unanimous verdicts are more likely to fulfill the jury's role as the voice of the community's conscience.  When less than a unanimous jury is allowed to speak for the community, the likelihood increases that the jury will misrepresent community values."  Raoul G. Cantero & Robert M. Kline, Death is Different: The Need for Jury Unanimity in Death Penalty Cases, 22 St. Thomas L. Rev. 4, 32 (2009) (citing Schriro v. Summerlin, 542 U.S. 348, 360 (2004) (Breyer, J., dissenting)).

The majority explains the significance of this Court's holding in Jones v. State that "any interference with the right to a unanimous jury verdict denies the defendant a fair trial as guaranteed by the Declaration of Rights of the Florida Constitution."  Majority op. at 26 (citing Jones, 92 So. 2d 261, 261 (Fla. 1956)). Given this State's historical adherence to unanimity and the significance of the right to trial by jury, the majority correctly concludes that article I, section 22, of the Florida Constitution requires that all of the jury fact-finding, including the jury's final recommendation of death, be unanimous.

**Eighth Amendment to the United States Constitution**

I also agree with the majority that the Eighth Amendment to the United States Constitution further supports the constitutional basis for requiring a unanimous jury recommendation.  The cruel and unusual punishment clause of the

Eighth Amendment was viewed by the Framers, and later by the United States Supreme Court, as "a 'constitutional check' that would ensure that 'when we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives.' " Furman v. Georgia, 408 U.S. 238 at 261 (1972) (Brennan, J., concurring). As Justice Kennedy has stated, "Jury unanimity . . . is an accepted, vital mechanism to ensure that real and full deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community." McKoy v. North Carolina, 494 U.S. 433, 452 (1990) (Kennedy, J., concurring).

Due to the severity and irreversibility of death, "the Eighth Amendment requires [in capital cases] a greater degree of accuracy . . . than would be true in a noncapital case." Gilmore v. Taylor, 508 U.S. 333, 342 (1993). As some commentators, including former Justice Raoul Cantero, have observed:

> The Supreme Court has consistently recognized that the death penalty is "qualitatively different" from all other punishments, and therefore "demands extraordinary procedural protection against error."
>  . . .
> Because "death is different," allowing a simple majority to render a verdict in a capital case may violate the Eighth Amendment's prohibition on cruel and unusual punishment.

Cantero & Kline, Death is Different, 22 St. Thomas L. Rev. at 12-13 (citing Jeffrey Abramson, Death-is-Different Jurisprudence and the Role of the Capital Jury, 2 Ohio St. L.J. Crim. L. 117, 117 (2004)) (emphasis added).

Not only does jury unanimity further the goal that a defendant will receive a fair trial and help to guard against arbitrariness in the ultimate decision of whether a defendant lives or dies, jury unanimity in the jury's final recommendation of death also ensures that Florida conforms to "the evolving standards of decency that mark the progress of a maturing society," which inform Eighth Amendment analyses. Roper v. Simmons, 543 U.S. 551, 561 (2005) (quoting Trop v. Dulles, 356 U.S. 86, 100-01 (1958) (plurality opinion)); see also Hall v. Florida, 134 S. Ct. 1986, 1992 (2014) ("The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be. This is to affirm that the Nation's constant, unyielding purpose must be to transmit the Constitution so that its precepts and guarantees retain their meaning and force.").

At the time Ring was decided, death was not a penalty in twelve states.[24] Since the United States Supreme Court decided Ring, seven additional states have eliminated the death penalty as a punishment altogether. See Hall, 134 S. Ct. at 1997 (noting that Connecticut, Illinois, Maryland, New Jersey, New Mexico, and New York have eliminated the death penalty since 2002); S.B. 268, 104th Leg. 1st

---

24. The states without a death penalty when Ring was decided are, from earliest to most recent in abolishing the death penalty: Michigan, Wisconsin, Maine, Minnesota, Alaska, Hawaii, Vermont, West Virginia, North Dakota, Iowa, Massachusetts, and Rhode Island. See States With and Without the Death Penalty, Death Penalty Info. Ctr., http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited Sept. 22, 2016).

Sess. (Neb. 2015) (repealing the death penalty). Therefore, when Hurst v. Florida was decided, a total of nineteen states had eliminated the death penalty.

As to the requirement of jury unanimity, until Hurst v. Florida, Florida was one of only three states that permitted capital defendants to be sentenced to death without all twelve penalty phase jurors recommending in unison that the defendant was deserving of the ultimate punishment. See majority op. at 39. Of the thirty-one states that still had the death penalty at the time of Hurst v. Florida, twenty-eight states required a unanimous vote of twelve jurors with respect to the final verdict or recommendation, making Florida, Alabama, and Delaware glaring outliers.[25] However, Delaware just recently declared its capital sentencing statute unconstitutional. Rauf v. Delaware, 2016 WL 4224252 (Del. Aug. 2, 2016). The United States Supreme Court has also vacated the death sentences of four Alabama inmates in light of Hurst v. Florida. See Russell v. Alabama, No.15-9918, 2016 WL 3486659 (U.S. Oct. 3, 2016); Kirksey v. Alabama, 136 S. Ct. 2409 (2016); Wimbley v. Alabama, 136 S. Ct. 2387 (2016); Johnson v. Alabama, 136 S. Ct. 1837 (2016).[26]

---

25. Moreover, federal law provides that a jury must unanimously recommend whether a defendant should be sentenced to death. 18 U.S.C. § 3953(e) (2016).

26. Additionally, although contrary to our decision today, the Alabama Supreme Court recently decided that its capital sentencing scheme is constitutional under Hurst v. Florida because its capital sentencing scheme requires the jury to

The current practices of these other states emphasize Florida's outlier status, as this Court expressly acknowledged eleven years ago in State v. Steele, 921 So. 2d 538, 548 (Fla. 2005). In that case we observed that Florida was then "the only state in the country that allows a jury to decide that aggravators exist and to recommend a sentence of death by a mere majority vote." Id. (first emphasis added). At the time, we acknowledged that even though Alabama and Delaware did not require unanimity as to the jury's final recommendation, they at least required unanimity as to the jury's finding of at least one aggravator. Id. at 548-49, n.4 & 5.

Taken together, the trend of states either eliminating the death penalty as a punishment or requiring jury unanimity in fact-finding and the final recommendation before sentencing a defendant to death demonstrates "the evolving standards of decency" with respect to the jury's fact-finding role in capital punishment in the United States. Roper, 543 U.S. at 561. This trend solidifies Florida's devolution from an outlier to an extreme outlier.

_____

unanimously find one aggravating factor when determining if a defendant is eligible for the death penalty. See Ex parte Bohannon, No. 1150640, 2016 WL 5817692, at *5 (Ala. Sept. 30, 2016). However, we note that the Alabama Supreme Court in Bohannon did not discuss its statute's constitutionality under its own state constitution and did not mention the Alabama cases remanded by the United States Supreme Court in light of Hurst v. Florida.

The United States Supreme Court has also considered international trends when addressing Eighth Amendment claims, and these trends further confirm Florida's outlier status.  Id. 543 U.S. at 577-78.  Amnesty International's 2015 Report indicates that the United States was the only member of the Organization of American States (OAS)—an organization whose thirty-five member nations aim to uphold the pillars of democracy, human rights, security, and development—to carry out executions, and one of the countries with the most executions in the world.[27]  Both Florida and the United States are outliers as to the imposition of the death penalty, and Florida's non-unanimous recommendation for imposing the death penalty only entrenches the State in outlier territory.

For all of these reasons, I agree that the failure to require jury unanimity before the ultimate decision of death is imposed violates the Eighth Amendment.

## Unanimity of the Final Recommendation is Properly Addressed

Finally, I address the dissent's argument that in requiring unanimity in the final jury recommendation this Court exceeds the scope of its proper considerations in this case.  See Canady, J., dissenting op. at 76.  Contrary to the dissent's assertions, the issue of a unanimous recommendation is properly at issue

---

27. See Amnesty Int'l, Global Report: Death Sentences and Executions 2015 10, http://www.amnestyusa.org/research/reports/death-sentences-and-executions-2015 (2015); Org. of Am. States, Who We Are, http://www.oas.org/en/about/who_we_are.asp (last visited September 21, 2016).

in this case. In <u>Hurst v. Florida</u>, the United States Supreme Court instructed that "[t]he judgment of the Florida Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion." 136 S. Ct. at 624. Nowhere in the opinion is the requirement that this Court may only consider "how we are to apply <u>Hurst v. Florida</u>'s Sixth Amendment holding," as the dissent suggests. <u>See</u> Canady, J., dissenting op. at 76. The <u>Hurst v. Florida</u> remand requires only that this Court's proceedings not be inconsistent with the United States Supreme Court's opinion in <u>Hurst v. Florida</u>. 136 S. Ct. at 624. This Court's decision is based on both Florida's constitutional right to jury trial as well as the federal Sixth and Eighth Amendments.

This Court's opinion is firmly rooted in article I, section 22, of the Florida Constitution. As to the Eighth Amendment argument, the last time this Court actually considered an Eighth Amendment argument on its merits was decades ago. <u>See</u> <u>Alvord</u>, 322 So. 2d at 533; <u>Watson v. State</u>, 190 So. 2d at 161. Subsequently, the Court has rejected the claim, providing virtually no analysis and seemingly relying on cases from this Court dating back to the reinstitution of the death penalty, and so it is unclear whether the claim was based on the Eighth Amendment or some other constitutional ground. <u>See, e.g.</u>, <u>Hunter v. State</u>, 175 So. 3d 699, 710 (Fla. 2015) (denying this argument by citing to this Court's previous rejection of the same argument); <u>Ford v. State</u>, No. SC14-1011, SC14-

2040, 2015 WL 1741803 (Fla. Apr. 15, 2015) (denying Eighth Amendment claim because it "has been repeatedly rejected by this Court"), cert. denied, 136 S. Ct. 538 (2015); Kimbrough v. State, 125 So. 3d 752, 754 (Fla. 2013) (denying the claim due to this Court's "general jurisprudence that non-unanimous jury recommendations to impose the sentence of death are not unconstitutional"); Robards v. State, 112 So. 3d 1256, 1267 (Fla. 2013); Mann v. State, 112 So. 3d 1158, 1162 (Fla. 2013); Lazelere v. State, 676 So. 2d 394, 407 (Fla. 1996) (explaining that the claim had been "previously rejected" without addressing the merits); Hunter v. State, 660 So. 2d 244, 252-53 (Fla. 1995); James v. State, 453 So. 2d 786, 792 (Fla. 1984) (rejecting the claim based on Alvord).

Following this Court's rejections of the Eighth Amendment argument challenging Florida's capital sentencing scheme for allowing a non-unanimous recommendation of death, the United States Supreme Court issued its decision in Hurst v. Florida, which did not address the Eighth Amendment. Therefore, there is no United States Supreme Court precedent this Court must follow asserting that the Eighth Amendment does or does not require unanimity in jury capital sentencing recommendations.

Clearly our holding requiring unanimity in the jury's ultimate recommendation is not inconsistent with Hurst v. Florida or any other decision from the United States Supreme Court. Moreover, the issue of unanimity in the

final recommendation was raised before this Court in Hurst v. State, argued before the United States Supreme Court in Hurst v. Florida, raised by Hurst in his Motion requesting imposition of a life sentence,[28] and serves to provide a complete analysis of what the Florida and United States Constitutions require before the death penalty can be constitutionally imposed.

For all these reasons, I fully concur in the majority's opinion today.

LABARGA, C.J., concurs.

PERRY, J., concurring in part and dissenting in part.

I concur with the entirety of the majority decision except its determination that section 775.082(2), Florida Statutes (2016), is not applicable. See majority op. at 4, 44-51. I therefore disagree with the majority's decision to remand for a new penalty phase proceeding instead of remanding for imposition of a life sentence. Id. at 4, 50.

There is no compelling reason for this Court not to apply the plain language of section 775.082(2), Florida Statutes, and instead contort all reasoning to apply a

_____

28. Hurst's Amended Motion for Remand for Imposition of a Sentence of Life in Prison raising the Eighth Amendment argument was filed shortly after the issuance of the Supreme Court mandate, even before Hurst's Supplemental Initial Brief on the Merits was filed in front of this Court on remand. While the majority addresses the Eighth Amendment basis for unanimity in addition to the Sixth Amendment argument, we have rejected his argument that section 775.082(2), Florida Statutes (2016), requires reducing his sentence to life.

sentencing statute that cannot be resuscitated.  Because the majority of this Court

has determined that Hurst's death sentence was unconstitutionally imposed, see

majority op. at 58, Hurst is entitled to the clear and unambiguous statutory remedy

that the Legislature has specified.  See § 775.082(2), Fla. Stat. (2016).

The statute's language is clear and unambiguous:

> In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1).  No sentence of death shall be reduced as a result of a determination that a method of execution is held to be unconstitutional under the State Constitution or the Constitution of the United States.

Id.

The plain language of the statute does not rely on a specific amendment to

the United States Constitution, nor does it refer to a specific decision by this Court

or the United States Supreme Court.  Further, it does not contemplate that all forms

of the death penalty in all cases must be found unconstitutional.  Instead, the

statute uses singular articles to describe the circumstances by which the statute is to

be triggered.  Indeed, the statute repeatedly references a singular defendant being

brought before a court for sentencing to life imprisonment.  "[T]he death penalty in

[Hurst's] capital felony [has been] held to be unconstitutional," and accordingly,

"the court having jurisdiction over [Hurst, who was] previously sentenced to death

- 71 -

for a capital felony[,] shall cause [him] to be brought before the court, and the court shall sentence [him] to life imprisonment." Id. We need conduct no further legal gymnastics to carry out the will of the Legislature. See, e.g., English v. State, 191 So. 3d 448, 450 (Fla. 2016) ("When the statutory language is clear or unambiguous, this Court need not look behind the statute's plain language or employ principles of statutory construction to determine legislative intent."). The sentencing court must impose a life sentence pursuant to section 775.082(2), Florida Statutes.

My reasoning here is supported by no fewer than three former justices of this Court: Rosemary Barkett, Harry Lee Anstead, and Gerald Kogan; a former President of The Florida Bar, Hank Coxe, who also served on this Court's Innocence Commission; and a former president of The American Bar Association, Talbot D'Alemberte, who chaired Florida's Constitution Revision Commission and the Judiciary Committee in the Florida House of Representatives during the 1972 session, when the Legislature enacted section 775.082(2), Florida Statutes. See Amended Brief of Amici Curiae Harry Lee Anstead, et al., at 6, Hurst v. State, No. 12-1947 (Fla. May 3, 2016) ("The plain language contained in the first sentence of section 775.082(2) could not offer a clearer command . . . .").

The argument that section 775.082(2), Florida Statutes, applies only if capital punishment were itself unconstitutional and not if the capital punishment

procedure in a particular case were invalid is contrary to the text of the statute. Such argument also runs counter to this Court's actions forty years ago, when the Court vacated death sentences and imposed life sentences in the wake of Furman v. Georgia, 408 U.S. 238 (1972), a United States Supreme Court decision invalidating certain death penalty procedures. See id. at 309 ("The Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."); Stewart v. Massachusetts, 408 U.S. 845, 845 (1972). This Court responded, not by ordering new Furman-compliant capital penalty phase proceedings for these death row prisoners, but by vacating existing death sentences and ordering the prisoners sentenced to life in prison. See In re Baker, 267 So. 2d 331, 335 (Fla. 1972); Anderson v. State, 267 So. 2d 8, 10 (Fla. 1972). This Court never conceded that capital punishment as a whole was unconstitutional and did not read Furman to hold otherwise. Dixon, 283 So. 2d at 6 ("[Furman] does not abolish capital punishment . . . ."); Baker, 267 So. 2d at 331 ([D]eath sentences previously imposed are void . . . .") (emphasis added); Anderson, 267 So. 2d at 9 ("Although this Court has never declared the death penalty to be unconstitutional, we nevertheless recognized and followed the con[s]ensus determination of the several opinions rendered by the United States Supreme Court in [Furman]."). The Court even expressly noted that section 775.082(2) "was conditioned upon the very

holding which has now come to pass by the United States Supreme Court in invalidating the death penalty <u>as now legislated</u>." <u>Donaldson v. Sack</u>, 265 So. 2d 499, 505 (Fla. 1972) (emphasis added). Nonetheless, the Court vacated death sentences and imposed life sentences in their place. <u>See</u> <u>Baker</u>, 267 So. 2d at 335; <u>Anderson</u>, 267 So. 2d at 10. There is absolutely no logical reason for not doing so here. I consequently cannot agree with the majority's reasoning that the statute was intended as a fail-safe mechanism for when this Court or the United States Supreme Court declared that the death penalty was categorically unconstitutional. <u>See</u> majority op. at 50. This Court should follow its existing precedent and impose a life sentence.

CANADY, J., dissenting.

Because I conclude that the Sixth Amendment as explained by the Supreme Court's decision in <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016), simply requires that an aggravating circumstance be found by the jury, I disagree with the majority's expansive understanding of <u>Hurst v. Florida</u>.[29] And because I conclude that the absence of a finding of an aggravator by the jury that tried Hurst was harmless

---

29. The view expressed in this dissent concerning the scope of <u>Hurst v. Florida</u> follows the same line of analysis recently adopted by the Supreme Court of Alabama in rejecting a challenge to Alabama's death penalty law. <u>See</u> <u>Ex parte Bohannon</u>, No. 1150640, 2016 WL 5817692, at *5 (Ala. Sept. 30, 2016) ("<u>Ring</u> and <u>Hurst</u>[ v. Florida] require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty—the plain language in those cases requires nothing more and nothing less.").

beyond a reasonable doubt and agree with the majority's rejection of Hurst's claim that he is entitled to be sentenced to life, I would affirm the sentence of death.

The majority concludes that the Supreme Court decided in Hurst v. Florida that the Sixth Amendment requires jury sentencing in death cases so that no death sentence can be imposed unless a unanimous jury decides that death should be the penalty. But this conclusion cannot be reconciled with the reasoning of the Court's opinion in Hurst v. Florida or with the underlying framework established by the Court in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002). The majority's reading of Hurst v. Florida wrenches the Court's reference to "each fact necessary to impose a sentence of death," 136 S. Ct. at 619, out of context, ignoring how the Court has used the term "facts" in its Sixth Amendment jurisprudence, and failing to account for the Hurst v. Florida Court's repeated identification of Florida's failure to require a jury finding of an aggravator as the flaw that renders Florida's death penalty law unconstitutional.

Contrary to the majority's view, "each fact necessary to impose a sentence of death" that must be found by a jury is not equivalent to each determination necessary to impose a death sentence. The case law makes clear beyond any doubt that when the Court refers to "facts" in this context it denotes "elements" or their functional equivalent. And the case law also makes clear beyond any doubt that in the process for imposing a sentence of death, once the jury has found the element

- 75 -

of an aggravator, no additional "facts" need be proved by the government to the jury. After an aggravator has been found, all the determinations necessary for the imposition of a death sentence fall outside the category of such "facts."

This understanding of the use of the phrase "each fact necessary to impose a sentence of death" in Hurst v. Florida is consistent with Hurst v. Florida's repeated statements that the failure to require that a jury find an aggravator is the feature of Florida's death penalty law that renders it unconstitutional under the requirements of the Sixth Amendment as explained in Apprendi and Ring. Most saliently, Hurst v. Florida overrules Spaziano v. Florida, 468 U.S. 447 (1984)—which held that jury sentencing is not required by the Constitution in death cases—only to the extent that Spaziano did not require that the jury find an aggravator.

Not content with its undue expansion of Hurst v. Florida's holding regarding the requirements of the Sixth Amendment, the majority injects conclusions based on the Eighth Amendment even though Hurst v. Florida does not address the Eighth Amendment. Remarkably, the majority adopts the view of the Eighth Amendment expressed by Justice Breyer in his concurring opinions in Ring and Hurst v. Florida. In doing so, the majority addresses a question that is not even properly at issue in this remand proceeding—which solely concerns how we are to apply Hurst v. Florida's Sixth Amendment holding—and delivers a ruling that dramatically departs from binding precedent from the Supreme Court.

In short, the majority fundamentally misapprehends and misuses Hurst v. Florida, thereby unnecessarily disrupting the administration of the death penalty in Florida. I strongly dissent.

### Ring's Application of Apprendi:
### An Aggravator Constitutes an Element That Must Be Found by the Jury

In Apprendi, the Court held, based on the Sixth Amendment, that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be found to exist by the jury. 530 U.S. at 494. Although Apprendi sought to distinguish the sentencing process in death cases, Ring rejected that distinction and applied Apprendi to Arizona's death penalty law, which provided no role for the jury in the sentencing process.

Applying the logic of Apprendi, Ring concluded that before a sentence of death can be imposed, the Sixth Amendment entitles capital defendants "to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589 (emphasis added). The Court recognized that "a death sentence may not legally be imposed . . . unless at least one aggravating factor is found to exist beyond a reasonable doubt." Id. at 597 (citation omitted). The Ring Court thus framed the question to be decided: "The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee,

- 77 -

made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury." Id. (footnote omitted).

The Court concluded that "the aggravating factor determination" must be made by a jury. Id. So the Court reversed the Arizona decision affirming Ring's sentence and overruled Walton v. Arizona, 497 U.S. 639 (1990)—in which the Court had upheld the constitutionality of the Arizona statute against a Sixth Amendment challenge. Specifically, the Court "overrule[d] Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." Ring, 536 U.S. at 609. Justice Breyer concurred in the judgment and stated his conclusion "that the Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death." Id. at 614 (Breyer, J., concurring).

In sum, Ring held that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." Id. at 609 (quoting Apprendi, 530 U.S. at 494 n.19). The reasoning of Ring thus is predicated on the understanding that "for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of 'murder' is a distinct, lesser included offense of 'murder plus one or more aggravating circumstances' " and that murder without an aggravator "exposes a defendant to a maximum penalty of life imprisonment" but

murder with an aggravator "increases the maximum permissible sentence to death." Sattazahn v. Pennsylvania, 537 U.S. 101, 111 (2003) (plurality opinion).

**Hurst v. Florida's Application of Ring:**
**A Jury's Advisory Recommendation of Death**
**Cannot Be Treated as the Jury's Finding of an Aggravator**

Hurst v. Florida simply applies the reasoning of Ring and Apprendi to Florida's death penalty statute and concludes that the jury's advisory role under Florida law does not satisfy the requirements of the Sixth Amendment. Hurst v. Florida goes beyond Ring because Hurst v. Florida addressed a sentencing process in which the jury played an advisory role as distinct from the process at issue in Ring in which the jury had no role. But the reasoning of Hurst v. Florida closely mirrors the reasoning of Ring, and the requirements of the Sixth Amendment articulated in Hurst v. Florida are the same as the requirements articulated in Ring. Hurst v. Florida merely establishes that an advisory determination of a jury cannot satisfy Ring's requirement that an aggravator be found by the jury. In Hurst v. Florida, unlike numerous Florida direct appeal death cases in which the Court has denied relief under Ring, the existence of an aggravator was not established by a jury finding embodied in either a conviction for a contemporaneous crime or a prior conviction.

The Hurst v. Florida Court recognized the foundational importance of Apprendi's holding under the Sixth Amendment "that any fact that 'expose[s] the

defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to a jury." Hurst v. Florida, 136 S. Ct. at 621 (quoting Apprendi, 530 U.S. at 494). The Court observed that in Ring it "had little difficulty concluding that 'the required finding of an aggravated circumstance exposed Ring to a greater punishment than that authorized by the jury's guilty verdict.' " Id. (quoting Ring, 536 U.S. at 604).

Hurst v. Florida went on to hold that "[t]he analysis the Ring Court applied to Arizona's sentencing scheme applies equally to Florida's," id. at 621-22, and that the State was precluded from "treat[ing] the advisory recommendation by the jury as the necessary factual finding that Ring requires," id. at 622. That "necessary factual finding" is, of course, the finding that an aggravator exists. In its analysis, the Court took pains to reject the State's argument—which would have been dispositive—that Hurst had admitted the existence of an aggravator. Id. at 622-23. The Hurst v. Florida opinion concludes with this statement of the Court's holding regarding the Sixth Amendment: "Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional." Id. at 624.

In so holding, the Court accepted the precise Sixth Amendment argument that Hurst had presented to the Court. But in its imposition of jury sentencing, the majority here has adopted an understanding of Hurst v. Florida's Sixth

Amendment holding that not only departs from the Court's statement of its holding but also indisputably goes far beyond the Sixth Amendment argument that Hurst presented to the Court.

Hurst made an argument—supported by Justice Breyer's concurring opinion in Ring—for jury sentencing based on the Eighth Amendment. This Eighth Amendment argument was in Hurst v. Florida once again accepted by Justice Breyer in a concurring opinion, but it was not accepted by the Hurst v. Florida majority. Hurst did not, however, make any Sixth Amendment argument for jury sentencing. Instead, Hurst argued that "Florida's capital sentencing scheme violates" the Sixth Amendment as explained in Apprendi and Ring "because it entrusts to the trial court instead of the jury the task of 'find[ing] an aggravating circumstance necessary for imposition of the death penalty.' " Brief for Petitioner at 18, Hurst v. Florida, 136 S. Ct. 616 (2016) (No. 14-7505), 2015 WL 3523406, at *18 (quoting Ring, 536 U.S. at 609).[30] In the oral argument before the Court, Hurst's counsel summed up the Sixth Amendment argument:

> [L]eaving aside our Eighth Amendment point in our brief that -- that
> followed on Justice Breyer's concurrence in Ring, the -- this is all

---

30. This point followed the reasoning of Justice Pariente's dissent from this Court's decision regarding Hurst's sentence: "I dissent from the majority's affirmance of Hurst's death sentence because there is no unanimous finding by the jury that any of the applicable aggravators apply." Hurst v. State, 147 So. 3d 435, 452 (Fla. 2014) (Pariente, J., concurring in part and dissenting in part), cert. granted in part, 135 S. Ct. 1531 (2015), and rev'd, 136 S. Ct. 616 (2016).

about the eligibility, not the determination of what sentence applies. And you have held that the existence of a specified statutory aggravating factor is a condition. It is an element of capital murder, and it is, by statute and Florida Supreme Court decision, an element of capital murder in Florida."

Tr. of Oral Argument at 12, Hurst v. Florida, 136 S. Ct. 616 (2016) (No. 14-7505), 2015 WL 5970064, at *12.

### Hurst v. Florida's Limited Overruling of Precedent: Spaziano's Vindication of Judicial Sentencing is Undisturbed Except to the Extent That it Did Not Require the Jury to Find an Aggravator

In its articulation of the overruling of Spaziano and Hildwin—the two cases this Court relied on when rejecting Ring claims—the Hurst v. Florida Court once again makes clear the limited scope of its holding. Like Ring's overruling of Walton, Hurst v. Florida's overruling of Spaziano and Hildwin is precisely focused on the absence of a jury finding of an aggravator: "The decisions are overruled to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." Hurst v. Florida, 136 S. Ct. at 624.

Therefore, except "to the extent" that Spaziano and Hildwin "allow a sentencing judge to find an aggravating circumstance," they are left undisturbed by Hurst v. Florida. Of particular relevance here is the portion of Spaziano that is not affected by Hurst v. Florida. In Spaziano, the Court was urged to find Florida's death penalty law unconstitutional under both the Sixth and Eighth Amendments.

The Court unequivocally rejected the "fundamental premise" of Spaziano's argument: "that the capital sentencing decision is one that, in all cases, should be made by a jury." Spaziano, 468 U.S. at 458.

Rejecting Spaziano's Sixth Amendment argument, the Court stated: "[D]espite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue." Id. at 459 (citations omitted). Regarding the Eighth Amendment, the Court held that "there certainly is nothing in the safeguards necessitated by the Court's recognition of the qualitative difference of the death penalty that requires that the sentence be imposed by a jury." Id. at 460. The Court further explained "that the purpose of the death penalty is not frustrated by, or inconsistent with, a scheme in which the imposition of the penalty in individual cases is determined by a judge." Id. at 462-63. The Court summed up its rejection of the "fundamental premise" regarding jury sentencing argued by Spaziano:

> In light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional.

Id. at 464.

The majority decision here collides with these undisturbed and binding holdings of Spaziano regarding both the Eighth Amendment and the Sixth Amendment. There is no plausible explanation of why the Court would overrule Spaziano only to the extent that Spaziano did not require the jury to find an aggravator if the Court intended to hold that jury sentencing is required in death cases. Indeed, neither the majority opinion nor the concurrence even attempts to offer such an explanation. The point is met with total silence.

**The Majority's Basic Error:**
**Confusing "Facts" with Other Determinations**
**in the Sentencing Process**

The majority's misinterpretation of Hurst v. Florida is rooted in its misunderstanding of the Court's Sixth Amendment jurisprudence concerning "facts" that must be found by a jury. The majority confuses the "facts" that must be proved by the government to a jury in order for a defendant to pass the threshold of eligibility for a death sentence with the other determinations that may lead to the imposition of a death sentence. This confusion apparently causes the majority to overlook the limited nature of the overruling of Spaziano as well as Hurst v. Florida's focus—in which it follows Ring—on the absence of an aggravator found by a jury.

Apprendi, Ring, and Hurst v. Florida are all based on the principle that the Sixth Amendment requires that a jury—rather than a judge—determine whether

the government has proved every element of an offense.  The Court therefore has explained that "the essential Sixth Amendment inquiry is whether a fact is an element of the crime" and that "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury."  Alleyne v. United States, 133 S. Ct. 2151, 2162 (2013).  "Elements" are "facts" that the State must prove to the jury.  Ring made clear and Hurst v. Florida reaffirmed that in death cases, the necessary elements include the existence of an aggravating circumstance.  But the other determinations made in a death penalty proceeding—whether the aggravation is sufficient to justify a death sentence; whether mitigating circumstances (which are established by the defendant) outweigh the aggravation; whether a death sentence is the appropriate penalty—are not elements to be proven by the State.  Rather, they are determinations that require subjective judgment.  And nothing in Ring or Hurst v. Florida suggests—much less holds—that such determinations are elements and therefore "facts" that must be found by a jury.

This understanding of the distinction between the facts that the government must prove to the jury and the other determinations required to be made in the process for imposing a death sentence is reinforced by comments made in the Supreme Court's opinion in Kansas v. Carr, 136 S. Ct. 633 (2016), which was released after Hurst v. Florida.  In Carr, the Court referred to the determination of

the existence of an aggravating circumstance as the "eligibility phase" in which it is decided whether a defendant is eligible for a death sentence. 136 S. Ct. at 642. After a defendant is determined to be "eligibl[e]", the "selection phase" occurs in which the existence of mitigating circumstances is determined, and a judgment is made whether mitigating circumstances outweigh the aggravation to determine whether a death-eligible defendant should be selected to receive a death sentence. Id. The Court explained that although the determination of whether an aggravating circumstance does or does not exist "is a purely factual determination," a determination of whether mitigation exists "is largely a judgment call," and "what one juror might consider mitigating another might not." Id. Whether the mitigating circumstances outweigh aggravating circumstances, the Court said, "is mostly a question of mercy." Id.; see also Tuilaepa v. California, 512 U.S. 967, 973 (1994) (stating that "[e]ligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death,' " while "[t]he selection decision . . . requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability" (quoting Arave v. Creech, 507 U.S. 463, 471 (1993))).

Thus, the only factual findings necessary to impose a sentence of death are findings regarding the elements of first-degree murder plus the existence of an aggravating circumstance, which is the functional equivalent of an element. Neither the Sixth Amendment nor Hurst v. Florida requires a jury to determine the sufficiency of the aggravation, the weight of the aggravation relative to any mitigating circumstances, or whether a death sentence should be imposed.

**The Absence Here of an Aggravator Found by the Jury**
**Is Harmless Beyond a Reasonable Doubt**

Although Hurst's jury did not find an aggravator and no conviction reflected a jury finding of an aggravator, I would conclude that this error was harmless beyond a reasonable doubt. As Justice Alito explained in his dissent in Hurst v. Florida:

> The jury was told to consider two aggravating factors: that the murder was committed during the course of a robbery and that it was especially heinous, atrocious, or cruel. The evidence in support of both factors was overwhelming.
> The evidence with regard to the first aggravating factor—that the murder occurred during the commission of a robbery—was as follows. The victim, Cynthia Harrison, an assistant manager of a Popeye's restaurant, arrived at work between 7 a.m. and 8:30 a.m. on the date of her death. When other employees entered the store at about 10:30 a.m., they found that she had been stabbed to death and that the restaurant's safe was open and the previous day's receipts were missing. At trial, the issue was whether Hurst committed the murder. There was no suggestion that the murder did not occur during the robbery. Any alternative scenario—for example, that Cynthia Harrison was first murdered by one person for some reason other than robbery and that a second person came upon the scene

shortly after the murder and somehow gained access to and emptied the Popeye's safe—is fanciful.

The evidence concerning the second aggravating factor—that the murder was especially "heinous, atrocious, or cruel"—was also overwhelming. Cynthia Harrison was bound, gagged, and stabbed more than 60 times. Her injuries included facial cuts that went all the way down to the underlying bone, cuts through the eyelid region and the top of her lip, and a large cut to her neck which almost severed her trachea. It was estimated that death could have taken as long as 15 minutes to occur. The trial court characterized the manner of her death as follows:

> The utter terror and pain that Ms. Harrison likely experienced during the incident is unfathomable. Words are inadequate to describe this death, but the photographs introduced as evidence depict a person bound, rendered helpless, and brutally, savagely, and unmercifully slashed and disfigured. The murder of Ms. Harrison was conscienceless, pitiless, and unnecessarily torturous.

In light of this evidence, it defies belief to suggest that the jury would not have found the existence of either aggravating factor if its finding was binding.

Hurst v. Florida, 136 S. Ct. at 626 (Alito, J., dissenting) (citations omitted).

On the basis of the record here I would conclude that any rational juror would have found that both of the two aggravating circumstances on which the trial court relied in imposing the death sentence were proven beyond a reasonable doubt. Although the jury may not have reached unanimous determinations regarding the sufficiency of the aggravating circumstances, whether they were outweighed by the mitigating circumstances, and whether a death sentence should

be imposed, such determinations—as I have explained—are not required by Hurst

v. Florida or the Sixth Amendment.  Hurst's death sentence should be affirmed.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Escambia County,
        Linda Lee Nobles, Judge - Case No. 171998CF001795XXXAXX

Nancy Ann Daniels, Public Defender, David A. Davis, William Carl McLain, and
Nada Margaret Carey, Assistant Public Defenders, Second Judicial Circuit,
Tallahassee, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, and Carine L. Mitz, Assistant Attorney
General, Tallahassee, Florida,

        for Appellee

Robert C. Josefsberg of Podhurst Orseck, P.A., Miami, Florida; Robert G.
Kerrigan of Kerrigan, Estess, Rankin, McLeod & Thompson, LLP, Pensacola,
Florida; Karen Marcia Gottlieb, Florida Center for Capital Representation at
Florida International University College of Law, Miami, Florida; and Sonya
Rudenstine, Gainesville, Florida,

        for Amici Curiae Justice Harry Lee Anstead, Judge Rosemary Barkett,
        Martha Barnett, Talbot D'Alemberte, Hank Coxe, Justice Gerald Kogan,
        Florida Association of Criminal Defense Lawyers, Florida Capital Resource
        Center, and Florida Center for Capital Representation at Florida
        International University College of Law